NOLEN v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:NOLEN v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 NOLEN v. STATE
2021 OK CR 5
Case Number: D-2017-1269
Decided: 03/18/2021
ALTON ALEXANDER NOLEN, Appellant v. STATE OF OKLAHOMA, Appellee.
Cite as: 2021 OK CR 5, __ __

 

 

O P I N I O N

ROWLAND, VICE PRESIDING JUDGE:

¶1 Appellant, Alton Alexander Nolen, was charged in the District Court of Cleveland County, Case No. CF-2014-1792, with First Degree Malice Murder (Count 1) in violation of 21 O.S.Supp.2012, § 701.7(A). He was also charged with Assault and Battery with a Deadly Weapon (Count 2) in violation of 21 O.S.2011, § 652 and Assault with a Dangerous Weapon (Counts 3-6) in violation of 21 O.S.2011, § 645, each After Former Conviction of Two or More Felonies. As to Count 1, the State sought the death penalty, and alleged four statutory aggravating circumstances in support thereof: (1) that Nolen was previously convicted of a felony involving the use or threat of violence to the person;[1] (2) that Nolen knowingly created a great risk of death to more than one person;[2] (3) that the murder was especially heinous, atrocious, or cruel;[3] and (4) that there existed a probability that Nolen would commit criminal acts of violence that would constitute a continuing threat to society.[4]

¶2 The jury imposed the death penalty on Count 1 after finding the existence of each alleged aggravating circumstance. It assessed punishment at life in prison on Counts 2, 4, and 5; fifty-five years imprisonment on Count 3, and seventy-five years imprisonment on Count 6. The Honorable Lori Walkley, District Judge, who presided at trial, sentenced Nolen accordingly and ordered the terms of imprisonment to be served consecutively. From this judgment and sentence Nolen appeals. We affirm.

BACKGROUND

¶3 On September 25, 2014, Alton Nolen was working the bruschetta line with several other employees at Vaughn Foods in Moore, Oklahoma. One of his co-workers, Traci Johnson, who was new to the job, told him to stir the mixture more thoroughly and to put his back into it. She told him that he was lazy and that he needed to "man up." Nolen became defensive and agitated and said, "I hate white people, I beat white people up." Johnson ran from the line and reported the perceived threat to a supervisor, Timothy Bluford. After having Johnson write out a statement about the incident, Bluford spoke with Nolen and had him write out a statement as well.[5] Bluford advised Human Resources about the threat and subsequently delivered Nolen to a security guard who escorted him from the facility. Nolen was suspended pending an investigation.

¶4 After he left work, Nolen went back to his apartment where he retrieved a butcher knife. He returned to Vaughn Foods around 4:00 p.m. with the knife concealed in his boot. Although he no longer was authorized to enter, he gained access to the building by going inside through a door as another employee was leaving. Nolen went to the administrative area of the building where Colleen Hufford had stepped into Gary Hazelrigg's office to discuss a purchase order. As Hazelrigg glanced down to look at the document, he noticed movement in his peripheral vision. When Hazelrigg looked up, he saw Nolen grabbing Hufford from behind.

¶5 Nolen pinned Hufford's head to his body by putting his left forearm across her forehead, fully exposing her neck. Nolen held a knife in his right hand, which he drew across her throat inflicting a deep wound. As Hazelrigg rose from his chair to help Hufford, Nolen spun her around and pushed her out into an open area. When Hufford was on her back on the floor, Nolen straddled her and continued cutting her throat. Hazelrigg started screaming and trying unsuccessfully to pull Nolen off Hufford. Another employee, Sam Thurman, came upon the assault, ran toward Nolen, hit him, and tried to get him off Hufford. This was not successful; Nolen was not fazed and did not stop cutting Hufford's neck. Thurman left the area and yelled for help. He called 911 and then started telling people to leave.

¶6 Mark Vanderpool and Bryan Aylor were outside the building when they heard someone screaming for help and saying that someone was "cutting Colleen." They ran back into the building and came upon Nolen who was on the floor beside Hufford still cutting her neck with a knife. Hazelrigg was trying unsuccessfully to pull Nolen off Hufford. Vanderpool kicked Nolen under the chin as hard as he could with steel-toe boots. Nolen fell back slightly and then slashed toward Vanderpool with the knife. Vanderpool and two other employees ran from the area. Nolen stood up and Aylor grabbed his wrist. Aylor pushed Nolen up against a doorway but Nolen overpowered him causing Aylor to fall on his back to the floor. Aylor held Nolen's wrist and kicked at Nolen as Nolen tried to force the knife down to stab Aylor. Finally, Nolen just stood up and ran back to Hufford. Aylor jumped up and ran from the building.

¶7 When Nolen was interacting with the others, Hazelrigg made a quick phone call to 911. While Hazelrigg was on the phone, Nolen returned and continued to slice Hufford's neck with his knife. After Hufford's head was completely detached from her body, Nolen stood up and approached Hazelrigg before he became distracted and left the area.

¶8 Traci Johnson had just changed her clothes preparing to go home when she stepped out of the locker room and saw Nolen in the hall close to the administrative offices. She froze and was unable to move when she saw the bloody knife in his hand. Nolen rushed toward her and pushed her up against a wall. He held her with his forearm and started slicing her neck. Johnson tried pushing him away as she screamed for help.

¶9 As this was happening, Mark Vaughn, the chief operating officer of Vaughn Foods, who was aware of the situation and had retrieved an AR-15 from his vehicle, arrived at the hallway where the assault was occurring. Vaughn yelled at Nolen to stop. Nolen stopped and took a few steps toward Vaughn before turning around as if to run back to Johnson. Vaughn moved eight to ten feet closer to Nolen and as he did, Nolen turned and started running toward Vaughn holding the bloody knife over his head. When Nolen was about fifteen feet from him, Vaughn yelled at Nolen to stop and then fired three rounds at him in rapid succession. Nolen did not fall but leaned against the wall of the hallway and lowered himself to the ground still clutching the knife. Nolen had been hit by the gunshots and was in obvious distress. The police and EMTs arrived shortly and transported Nolen to the hospital. Johnson was also treated by the medics and taken to the hospital for wounds to her neck. She subsequently had surgery to repair damaged veins in her neck.

¶10 Nolen was interviewed at the hospital that same day by two Moore Police detectives and two FBI agents. Nolen advised them that he was a Muslim and that he had beheaded someone because he felt oppressed. Nolen explained that he worked at Vaughn Foods and a woman with whom he was working called him an immature brat and criticized the way he was doing his job. The woman got him into trouble and he was sent to Human Resources where he was told to go home for a couple of days. At home he retrieved a knife which he took back to work. When he went back into the building he assaulted the first woman and cut off her head because he felt oppressed. He explained that this was condoned by the Koran and that he intended to cut her head all the way off. The other woman he assaulted was the one who had disrespected him by calling him an immature brat.

¶11 Nolen was interviewed a second time a few days later on September 28, 2014. His account of what happened was substantially the same in the second interview. Nolen added, however, that he told the woman who called him an immature brat that he "beat on Caucasians." Nolen explained that up until the day of the assaults he had worked at Vaughn Foods for two years without incident; he went to work on time, had only missed one day, he prayed five times a day, did not steal, and had not fought with anyone. When he was pulled from the line and sent to Human Resources he felt discriminated against and oppressed. Nolen stated in the interview that he did not regret what he had done because it would probably make Vaughn Foods a better place for Muslims to work at in the future.

¶12 Prior to trial Nolen sought to enter a guilty plea and indicated that he wanted the death penalty. Defense counsel argued that Nolen was not competent to enter a plea first based upon intellectual disability and then based upon mental illness. Extensive competency hearings were held on both of these issues. While the trial court found that Nolen was not precluded from entering a guilty plea based upon intellectual disability or mental illness, by the time these issues had been litigated, Nolen was no longer speaking to defense counsel or the trial court. Although the trial court gave Nolen the opportunity to plead guilty prior to voir dire, Nolen sat mute with his fingers over his ears and did not respond. Accordingly, the defense entered a plea of not guilty by reason of insanity and the case proceeded to jury trial.

1. Ineligibility for Death Penalty 

¶13 The United States Supreme Court has held that the Eighth Amendment prohibits the execution of intellectually disabled offenders. Atkins v. Virginia, 536 U.S. 304, 321 (2002). The issue of Nolen's alleged intellectual disability was raised below and an Atkins trial was held during which the jury heard testimony for five days. At the conclusion of the Atkins trial, the jury found that Nolen was not intellectually disabled. Nolen argues that this verdict was not supported by the evidence and that his death sentence must be vacated or modified.

¶14 The determination of whether a person is intellectually disabled is a question of fact and on appellate review, this Court gives great deference to the jury's finding. Lambert v. State, 2005 OK CR 26, ¶ 12, 126 P.3d 646, 653. This Court will not disturb the jury's verdict where "there is any competent evidence reasonably tending to support it." Howell v. State, 2006 OK CR 28, ¶ 41, 138 P.3d 549, 562. When the defendant challenges the sufficiency of the evidence following a jury finding that he is not intellectually disabled, "this Court will review the evidence in a light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion." Id. See also 21 O.S.Supp.2019, § 701.10b (I).[6]

¶15 While the United States Supreme Court held that the Constitution prohibits the execution of intellectually disabled offenders, it left "the task of developing appropriate ways to enforce the constitutional restriction" to the States. Atkins, 536 U.S. at 317 (quoting Ford v. Wainwright, 477 U.S. 399, 416-17 (1986)) (internal quotations omitted). The Supreme Court noted subsequently that this discretion is not without limitations. Hall v. Florida, 572 U.S. 701, 719 (2014)("Atkins did not give the States unfettered discretion to define the full scope of the constitutional protection"). Rather, determinations regarding claims of intellectual disability must be informed by the "views of medical experts." Id. at 721 ("It is the Court's duty to interpret the Constitution, but it need not do so in isolation. The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework."). States may not adopt factors that reflect superseded medical standards or that substantially deviate from prevailing clinical standards. Moore v. Texas, 581 U.S. ___, 137 S.Ct. 1039, 1049 (2017) (while states have discretion in determining whether a defendant is ineligible for the death penalty due to intellectual disability they may not disregard current medical standards).

¶16 Oklahoma statutes addressing intellectual disability for purposes of the death penalty align with the federal constitutional requirements and specifically provide that, "no defendant who is intellectually disabled shall be sentenced to death." 21 O.S.Supp.2019, § 701.10b(B). A defendant seeking to avoid eligibility for imposition of the death penalty based upon intellectual disability must demonstrate: (1) significantly subaverage general intellectual functioning; (2) concurrent significant limitations in adaptive functioning; and (3) manifestation of the intellectual disability before age eighteen. 21 O.S.Supp.2019, § 701.10b(C). Where the issue of intellectual disability is considered and answered by the jury, "[t]he defendant has the burden of production and persuasion to demonstrate an intellectual disability to the jury by a preponderance of the evidence." 21 O.S.Supp.2019, § 701.10b(F).

¶17 We address each of the three required determinations in turn.

Significantly Subaverage General Intellectual Functioning

¶18 Title 21 O.S.Supp.2019, § 701.10b(C) provides that "[a]n intelligence quotient of seventy (70) or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist is evidence of significantly subaverage general intellectual functioning . . . ."

¶19 Additionally, Section 701.10b(C) explicitly directs courts that "[i]n determining the intelligence quotient, the standard measurement of error for the test administrated shall be taken into account."

¶20 In May and June of 2015, Dr. Jeanne Russell, a licensed psychologist, administered to Nolen, individually, an intelligence quotient test.[7] Dr. Russell testified that she first administered a screening test commonly used within the psychological community -- the Wechsler Abbreviated Scale of Intelligence II (WASI-II). Based upon Nolen's score on the screening test, Dr. Russell determined a need to administer a full test. She administered the Wechsler Adult Intelligence Scale, Fourth Edition IQ test (WAIS-IV). Because she had administered the screening test so recently, Dr. Russell was concerned about the "practice effect" artificially inflating the test results.[8] To remedy this potential problem, Dr. Russell used both the WASI-II and the WAIS-IV, omitting from the full test portions that she administered in the screening test. She testified that she "followed the directions that were published and took out some of the same tests that [she] had already done and plugged them into the places where [she] would have done similar tests, so [she] used that score." The final score was a 69. Dr. Russell testified that this score placed Nolen into the "mild range of intellectual disability" even given the standard error of measurement of plus or minus five points which would have placed his score in the range of 64-74.

¶21 Dr. Daniel Reschly, a self-described specialist in intellectual disability with a Ph.D. in school psychology, also testified for the defense. Dr. Reschly noted that to his knowledge the IQ test administered by Dr. Russell was "the only individually administered intelligence test that was a good test administered to Mr. Nolen." Dr. Reschly testified that in administering the test, Dr. Russell followed the publisher's procedures and that it was common to administer a screening test first and follow it with a more in-depth measure. When asked whether Nolen's effort in taking the test could have affected the score, Dr. Reschly testified that the test given by Dr. Russell contained an embedded measure of effort internal to the test; the WAIS-IV contains the Reliable Digit Span. Dr. Reschly testified that the test given to Nolen indicated that he gave strong effort in taking the test. Dr. Reschly concluded that Nolen's test score met the criteria of having a low IQ in the range associated with mild intellectual disability.

¶22 The State countered the testimony of the defense expert witnesses with the testimony of Dr. Jarrod Steffan, a psychologist whose practice involves the routine performance of intelligence testing. Dr. Steffan questioned the accuracy of Dr. Russell's test results and the validity of the IQ test. He testified that he found problems with both Dr. Russell's administration of the IQ test and with her scoring of the test. Additionally, Dr. Steffan questioned the effort Nolen put forth in taking the IQ test.

¶23 Dr. Steffan questioned Dr. Russell's method of deriving the final test score from a combination of screening subtests and test subtests. He testified that he would never give a screening test in a high stakes case like a death penalty case, although he acknowledged on cross-examination that there was a very high correlation rate between the WASI-II and the WAIS-IV.

¶24 Dr. Steffan also expressed concern that Dr. Russell did not properly follow the "discontinue rule" in administering two of the screening subtests. Dr. Steffan explained that under the "discontinue rule" if a person misses a certain number of items consecutively they are considered to have maxed out on how well they will do on that subtest, so the administrator moves on to the next subtest. He opined on direct examination that this failure to follow the protocol "may not be important in the grand scheme of things, but you simply don't know." He agreed on cross-examination that it was unlikely that compliance with the "discontinue rule" would have raised Nolen's score above a 75.

¶25 Dr. Steffan also noted that there were two different scoring documents for a single subtest; one was scored 18 and one was scored 20. However, he acknowledged that the score given to him and used by Dr. Russell in calculating the IQ test results was the higher score even though both gave the same skilled score and made no difference in the final computation.

¶26 Dr. Steffan also testified about the errors he found in the calculation of scores on one of the subtests. One of these errors had no impact and did not change the final score. The other error did impact the final test score and correcting this error changed the score from a 69 to a 70.

¶27 When addressing his concerns about the measurement of effort that Nolen put into taking the test, Dr. Steffan testified that the research findings regarding the embedded Reliable Digit Span are mixed on whether it is a decent predictor of a person's actual effort. Dr. Steffan testified that the research suggests that a stand-alone or other measure of effort should be used to compensate for the limitations of the Reliable Digit Span.

¶28 Dr. Steffan concluded that the numerous errors in the administration and scoring of the IQ test showed carelessness that undermined his confidence in the test results. He testified that because the test was improperly administered and scored, the IQ test was invalid. Although Dr. Steffan challenged the accuracy of the IQ test administered by Dr. Russell, he could provide no contradictory results.

¶29 That IQ tests are imprecise measurements of intellectual disability is well established. The United States Supreme Court noted that many factors affect an individual's IQ test score including, "the test-taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing." Hall, 572 U.S. at 713 (citing American Association on Intellectual and Developmental Disabilities, R. Schalock et al., User's Guide To Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports 22 (2012) (AAIDD-11); A. Kaufman, IQ Testing 101, pp. 138--139 (2009)). The Supreme Court also recognized the tests themselves may be flawed or administered in a flawed manner. Id. at 714.

¶30 Despite their inherent fallibility, IQ tests are not determined, out of hand, to be invalid. Rather, to offset the fallibility of these tests, "[t]he professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range." Id. at 712. Accordingly, courts must take into account the test's "standard error of measurement" which "is generally thought to involve an error of measurement of approximately five points; hence, an IQ of 70 is considered to represent a band or zone of 65 to 75." Id. at 720 (quoting Diagnostic and Statistical Manual of Mental Disorders 28 (rev. 3d ed. 1987)). See also 21 O.S.Supp.2019, § 701.10b(C) ("In determining the intelligence quotient, the standard measurement of error for the test administered shall be taken into account.").

¶31 As noted above, Nolen's IQ test score -- even as corrected by Dr. Steffan - adjusted for the standard error of measurement yields a range of 65 to 75. Because the lower end of Nolen's score range falls at or below 70, which is within the range required to demonstrate significantly subaverage intellectual functioning, we move on to consider Nolen's adaptive functioning. Hall, 572 U.S. at 723 ("[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits."). See also Moore, 581 U.S. at ___, 137 S.Ct. at 1050 ("[I]n line with Hall, we require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits.").

Significant Limitations in Adaptive Functioning

¶32 Next, Nolen was required to demonstrate he suffers significant limitations in adaptive functioning. Title 21 O.S.Supp.2019, § 701.10b(A)(2) provides that "'[s]ignificant limitations in adaptive functioning' means significant limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health, safety, functional academics, leisure skills and work skills . . . ." Nolen argues on appeal that he made the requisite showing.

¶33 As with an evaluation of general intellectual functioning, a determination of deficits in adaptive functioning must be informed by the medical community's diagnostic framework. Moore, 581 U.S. at ___, 137 S.Ct. at 1050. Furthermore, "the medical community focuses the adaptive-functioning inquiry on adaptive deficits." Id. (emphasis in original) (citing AAIDD--11, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills")). See also Brumfield v. Cain, 576 U.S. 305, 320 (2015) ("[I]ntellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.'" (quoting American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 8 (10th ed. 2002)). Accordingly, in order to avoid overemphasis of adaptive strengths and lay stereotypes, our review focuses primarily, but not exclusively, on the expert testimony regarding Nolen's adaptive functioning deficits rather than on lay testimony about Nolen's adaptive strengths.[9]

¶34 Nolen presented evidence of his adaptive functioning deficits through the testimony of two experts. His first expert, Dr. Russell testified that she assessed Nolen's adaptive functioning capacities after administering the Vineland Adaptive Behavior Scales II (Vineland II) assessment. In order to complete the Vineland II assessment Dr. Russell reviewed Nolen's school records, spoke with Nolen, who she believed was not forthcoming, and interviewed his sister, Paige Nolen. Dr. Russell testified on direct examination, without much explanation, that based upon her conversations with Paige Nolen, she found that Nolen had significant adaptive functioning deficits in the areas of self-care, social skills, self-direction, health and safety, and functional academics.

¶35 Defense expert witness Dr. Reschly testified in more detail. He explained that current criteria for intellectual disability are established by the American Association on Intellectual and Developmental Disabilities (AAIDD) and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders Fifth Edition (DSM-5). He testified that the skill areas listed in Section 701.10b(A)(2) mirror the 1992 AAIDD classification manual. However, based upon adaptive behavior research, the 2002 AAIDD classification manual changed the categories into three, broader domains of adaptive behavior: conceptual, social, and practical. Dr. Reschly testified that despite this organizational change, the skills listed in the Oklahoma statute are encompassed within the three modern domains of adaptive behavior.

¶36 Dr. Reschly testified that the conceptual domain includes the use of language and literacy skills as well as the understanding and use of numbers relating to money and time. The social domain, he explained, has to do with social responsibility, getting along with others, following rules, and the degree to which one is gullible or easily tricked or cheated. Dr. Reschly testified that the practical domain encompasses basic self-care skills as well as more complex skills such as work, handling money, protecting one's health and safety, transportation, and use of technology. Dr. Reschly testified that he looked at a wide variety of information in forming an opinion about Nolen's adaptive behavior and he gave detailed testimony about the basis for his conclusions.

¶37 Dr. Reschly concluded that Nolen has significant deficits in some areas covered by the conceptual domain based upon his review of school records and interviews with people who knew Nolen during his years in school. Paige Nolen told Dr. Reschly that Nolen had difficulties with reading and language and that Nolen was retained in first grade because he had difficulty with reading and basic arithmetic. Dr. Reschly testified that although Nolen scored in the 60th percentile his second year of first grade, his scores on the Iowa Test of Basic Skills declined as he advanced through school.

¶38 Dr. Reschly learned from both Paige Nolen and some of Nolen's classmates that they believed Nolen was in special education classes in middle school and high school.[10] Dr. Reschly agreed on cross examination, however, that while he believed it likely that Nolen was in special education prior to high school, nobody in the school system said that Nolen was in special education classes at any time -- elementary school, middle school, or high school.[11]

¶39 The pattern of declining achievement continued and in high school Nolen did poorly, generally receiving failing or near failing grades. He was in a credit recovery curriculum at Booker T. Washington Academy his 10th through 12th years of high school. Dr. Reschly testified that in his experience, the life skills curriculum teaches practical skills to people with mild intellectual disability.[12] While Dr. Reschly testified that the classes Nolen took at Booker T. Washington were the type of life skills courses often used by persons with mild intellectual disability, he acknowledged that these classes served the additional purpose of credit recovery. Dr. Reschly also acknowledged that in addition to four life skills classes, Nolen took English II, English III, AP math I, AP math II, world history, and government while at Booker T. Washington his junior year. He took fine arts, math of fin., auto 1, earth science, English IV, and track his senior year. None of these classes were noted to be life skills classes. Nolen graduated from high school with a 2.09 GPA.

¶40 After high school Nolen attended Carl Albert and Langston University.[13] Nolen took developmental classes at Carl Albert to help him overcome deficits in academic skills. Nolen's grades were mostly Ds and Fs in these classes although while at Langston University he received an A in a psychology class and an A in an academic achievement seminar.

¶41 Dr. Reschly also concluded that as a child, adolescent, and adult Nolen had significant deficits in some of the adaptive skill areas within the social domain. Dr. Reschly spoke with Nolen's natural father, who said that Nolen had very poor decision-making skills and that he was easily exploited. Additionally, Dr. Reschly testified that others who knew Nolen well told him that Nolen had difficulty reading people and understanding appropriate social behaviors. Two of his childhood friends from football told Dr. Reschly that when they went to parties, Nolen would not interact with others; he would sit in the car and not participate. Some school peers relayed to Dr. Reschly that Nolen was frequently unable to follow conversations.[14] Although Nolen was a football player and understood when a game was coming up, he would not know who the opposing team was. He was described by family and peers as someone who was gullible and easily influenced by others; kids would ask him for money and he would give it to them.[15]

¶42 Dr. Reschly testified that Paige Nolen told him that as an adult, Nolen did not have many friends and did not go out or interact with others; he was not socially connected.[16] While Nolen was socially active on Facebook, his interactions there were sometimes socially inappropriate; he contacted women he had never met and asked if they would marry him and bring a dowry to the marriage. Additionally, Dr. Reschly said that Nolen's language and intellectual processing limitations hindered his social problem solving abilities at work.[17] On cross-examination, however, Dr. Reschly acknowledged that there was evidence that Nolen participated in social networks by going to the mosque on a semiregular basis. Despite his testimony that social behaviors may impede a person's ability to keep a job, Dr. Reschly acknowledged that prior to his commission of the crimes in this case, Nolen kept his job at Vaughn Foods for over a year.

¶43 Dr. Reschly testified that in the practical domain, Nolen displayed no significant deficiencies. Dr. Reschly found that Nolen met the basic expectations regarding the activities of daily living; he practiced self-care, lived independently and maintained his household, drove, held a job, and used technology. Dr. Reschly testified, however, that the ability to perform these functions neither proves nor disproves intellectual disability. While Dr. Reschly noted that Nolen had some weaknesses in the area of practical skills domain, his deficits were not significant limitations.

¶44 In conclusion, Dr. Reschly testified that Nolen's deficits in the modern category of conceptual domain equates to a finding of significant limitations in the adaptive skill areas of communication and functional academics under Section 701.10b(A)(2). His deficits in the modern category of social domain equates to a finding of significant limitations in the adaptive skill areas of social skills and leisure skills under Section 701.10b(A)(2). Finally, he concluded that Nolen had no significant limitations in the modern category of practical domain.

¶45 The State's expert witness, Dr. Steffan, disagreed with the conclusions reached by the defense expert witnesses finding flaws in their assessment and reaching different conclusions based upon much of the same evidence. Dr. Steffan agreed that the Vineland II test administered by Dr. Russell is an acceptable test to assess adaptive function. He did not, however, agree with the conclusion reached by Dr. Russell and Dr. Reschly that based upon the administration of this test, Nolen had significant deficits in two or more of the adaptive skill areas listed in Section 701.10b(A)(2).

¶46 Dr. Steffan testified that the Vineland II test results are only as reliable as the reporting upon which the test results are based. He testified that the person providing information for the Vineland II test should be "a person who knows the person well, who has known the person well over a long period of time, and who has known the person well in the recent past. A person who has frequent or regular contact with the individual."

¶47 Dr. Steffan was concerned that Paige Nolen was a biased reporter to Dr. Russell and that she did not possess a solid basis of knowledge regarding Nolen's adaptive skills. For instance, Dr. Russell testified that she relied upon Paige Nolen to conduct the Vineland II test because she was the only family member who would talk to her and because Nolen lived with her when they were children and when he got out of prison. However, as Dr. Steffan noted, other evidence showed that Paige Nolen had a limited basis of knowledge; she testified at trial that she lived with Nolen only part of the time when they were in elementary and middle school although they lived together during high school. Then Nolen lived with her for a short time after he got out of prison the first time; he moved out to move in with a girlfriend. Later, after he got out of prison the second time, he lived with her for three months before he moved into his own apartment. After he moved into his own apartment, Paige Nolen only visited him there once. Dr. Steffan testified that this sporadic contact gave Paige Nolen only a limited basis of knowledge allowing her to provide "probably unreliable information."

¶48 Dr. Steffan disagreed with Dr. Russell's and Dr. Reschly's conclusions about Nolen's skills in the area of functional academics. He noted that Dr. Russell estimated Nolen's reading ability to be at the fourth grade level. Dr. Steffan testified that people generally do not know the level of reading associated with the different grades indicating that one could not put much stock in Paige Nolen's reported estimate of Nolen's reading level. He testified that the average reading level in the United States is sixth grade, which is precisely the level at which Nolen scored when he took an the Test of Adult Basic Education (TABE) administered by the Department of Corrections when he went into prison at the age of twenty-seven.[18]

¶49 Dr. Steffan also noted that on the TABE Nolen scored in the 19th percentile in mathematic computations and 45th percentile in applied mathematics making his total math score in the 32nd percentile. While low, Dr. Steffan testified that this score placed Nolen within the average range. Finally, Dr. Steffan noted that Nolen scored in the 85th percentile in language on the TABE placing his cumulative score at the 58th percentile, within the average range. Dr. Steffan acknowledged the differences between Nolen's test scores on the IQ test, the Vineland II, and TABE, noting that the higher scores would be a result of best effort because "you can't fake having better intelligence" but one can put forth less effort to produce a lower test score.

¶50 Dr. Steffan also disagreed with Dr. Reschly's conclusions about Nolen's communication skills. He referenced a letter purportedly handwritten by Nolen while in prison to the director of the Department of Corrections. Dr. Steffan testified that the letter included identification, an introduction, persuasive argument, and concluded with well wishes for the recipient. Dr. Steffan acknowledged that the letter had some grammatical and typographical errors but the sentences were complete. Dr. Steffan also noted that he reviewed Facebook posts made by Nolen and while these were less formal, Nolen expressed understandable points and wrote in complete sentences.[19]

¶51 While Dr. Steffan specifically found no significant deficiencies in Nolen's functional academic and communication skills, he did not disregard that Nolen has some adaptive functioning deficits in the way he deals with his life. Dr. Steffan diagnosed Nolen with unspecified personality disorder with antisocial traits and attributed his adaptive functioning issues to the personality disorder. In conclusion, however, Dr. Steffan testified that he was unable to find any significant deficits in adaptive functioning due to intellectual disability.

¶52 As noted above, the opinions of the three experts about Nolen's limitations in adaptive functioning varied greatly. The defense experts only agreed with each other that Nolen suffered significant limitations in the two areas of functional academics and social skills. While each of them found significant limitations in other adaptive skill areas, they did not agree with each other about these; Dr. Russell found significant limitations in the skill areas of self-care, self-direction, and health and safety while Dr. Reschly found significant limitations in the skill areas of communication and leisure skills.[20] In contrast, while Dr. Steffan acknowledged that Nolen had some adaptive functioning deficits, he did not find any of these to be significant.

¶53 With the exception of Dr. Russell who largely gave conclusory opinions without detailed explanation, Dr. Reschly and Dr. Steffan spoke to the evidence and explained their conclusions. Both indicated that their conclusions were informed by the Vineland II administered by Dr. Russell, interviews with Nolen, Nolen's known academic record, and interviews with people who knew Nolen. They discussed how they reached their conclusions and the evidence upon which their conclusions were based. Each of the expert witnesses formed their opinions with regard to established medical practice and current medical standards. However, their conclusions about Nolen's adaptive functioning limitations were conflicting. Considering the testimony of the medical experts and the evidence that either supported their conclusions or refuted them, without giving undue emphasis to lay stereotypes or evidence of adaptive strengths, the jury could have found that Nolen failed to demonstrate, by a preponderance of the evidence, that he had significant limitations in two or more of the enumerated adaptive skills areas.

Manifestation Before the Age of Eighteen

¶54 Finally, Nolen was required to show that the onset of his intellectual disability manifested before he reached the age of eighteen. 21 O.S.Supp.2019, § 701.10b(C). He avers that he has made this showing.

¶55 Dr. Russell acknowledged the statutory requirement that the onset of intellectual disability manifested before the age of eighteen. She testified that the fact that Nolen was not administered an IQ assessment before the age of eighteen is not critical to the issue of age of onset. Dr. Russell noted Nolen's social deficiencies and his poor grades in elementary school, high school, and college, and the evidence that his sister helped him in school. She testified generally and briefly that his intellectual disability manifested before he reached the age of eighteen.

¶56 Dr. Reschly also testified that intellectual disability may be determined to have manifested before the age of eighteen even absent an early IQ test or official diagnosis as a child. He testified that Nolen's "low performance was certainly noticed before the age of 18 even though the IQ test - - as far as we know, the only IQ test given to him occurred after he was age 18 - - and that IQ test showed a very low intellectual functioning."

¶57 Finally, Dr. Steffan testified that he considered Nolen's grade school, middle school, and high school records to assess whether the onset of intellectual disability manifested before Nolen reached the age of eighteen. Dr. Steffan found it significant that in Nolen's testing from grade school, his scores ranged from the 2nd percentile to the 99th percentile on the different areas of academic skills. Dr. Steffan testified that this showed that Nolen was "doing variably. He did really well in some areas and poorly in other areas." Dr. Steffan noted that other factors could have affected his grades such as transitions from different schools and instability at home. Dr. Steffan also noted that the only time he was able to discern that Nolen had academic assistance was during 10th, 11th, and 12th grades when he was in the credit recovery program that "was separate from students who had intellectual disabilities or learning disorders or received special education services." Dr. Steffan relied upon school records, transcripts of testimony from school officials, educators, family, friends, and Nolen himself to determine that Nolen was not in special education. He also looked at Department of Corrections records and tests Nolen took there which did not indicate onset of intellectual disability before the age of eighteen. Based upon this evidence, Dr. Steffan concluded that Nolen did not show noticeable signs of intellectual disability before the age of eighteen.

¶58 As noted in the discussion above, the testimony by the expert witnesses with regard to the age of onset of Nolen's alleged intellectual disability conflicted. The defense expert witnesses testified that it manifested before the age of eighteen and the State's witness testified that it did not. The jury, in finding that Nolen does not suffer from intellectual disability, apparently reached the same conclusion regarding the age of onset as the State's expert witness. This conclusion was not an unreasonable determination of the facts.

¶59 The defense bore the burden of production and persuasion to demonstrate, by a preponderance of the evidence, that Nolen suffered significantly subaverage general intellectual functioning contemporaneously with significant limitations in at least two of the enumerated areas of adaptive functioning and that this intellectual disability manifested before the age of eighteen. The evidence, viewed in the light most favorable to the State, supports the jury's finding that Nolen did not show, by a preponderance of the evidence, that evidence of intellectual disability manifested before the age of eighteen. This proposition is denied.

2. Competency

¶60 Nolen complains that he was tried while incompetent to assist in his own defense, in violation of his right to due process of law as guaranteed by Fourteenth Amendment to the United States Constitution. The constitutional guarantee of due process of law includes the right to be tried only when one is sufficiently competent to understand the nature of the charges and to assist counsel in preparing a defense. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Drope v. Missouri, 420 U.S. 162, 171-72 (1975). The standard for competency to stand trial is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). Oklahoma has codified these constitutional requirements. See 22 O.S.2011, § 1175.1(1) (a person is competent to stand trial if he has "the present ability . . . to understand the nature of the charges and proceedings brought against him or her and to effectively and rationally assist in his or her defense"). The law presumes competence, requiring the defendant prove his incompetence by a preponderance of evidence. Grant v. State, 2009 OK CR 11, ¶ 8, 205 P.3d 1, 8 (citing Medina v. California, 505 U.S. 437, 452-53 (1992)).

¶61 There are two types of competency claims. "A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing, while a substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent." Lay v. Royal, 860 F.3d 1307, 1314 (10th Cir. 2017) (quoting McGregor v. Gibson, 248 F.3d 946, 952 (10th Cir. 2001) (en banc) (internal quotations omitted)). Nolen makes a substantive competency claim as he raised the issue early in the prosecution and he was found not to have proven his incompetency by a preponderance of the evidence in either of two separate, lengthy hearings, each of which we review in turn. We review the trial court's finding of competence for an abuse of discretion. Grant, 2009 OK CR 11, ¶ 9, 205 P.3d at 8. An abuse of discretion is a conclusion or judgment that is "clearly against the logic and effect of the facts presented." State v. Hooley, 2012 OK CR 3, ¶ 4, 269 P.3d 949, 950.

Competency Related to Intellectual Disability

¶62 On March 25, 2015, defense counsel filed an application for determination of competency. On this same date, the district court issued an order for the determination of competency. The order required that a doctor or doctors from the Oklahoma Department of Mental Health examine Nolen and make the following determinations required by 22 O.S.2011, § 1175.3(E):

1. If the person is able to appreciate the nature of the charges made against such person;

2. If the person is able to consult with the lawyer and rationally assist in the preparation of the defense of such person;

3. If the person is unable to appreciate the nature of the charges or to consult and rationally assist in the preparation of the defense, whether the person can attain competency within a reasonable period of time as defined in Section 1175.1 of this title if provided with a course of treatment, therapy or training;

4. If the person is a person requiring treatment as defined by Section 1-103 of Title 43A of the Oklahoma Statutes;

5. If the person is incompetent because the person is intellectually disabled as defined in Section 1408 of Title 10 of the Oklahoma Statutes;

6. If the answers to questions 4 and 5 are no, why the defendant is incompetent; and

7. If the person were released, whether such person would presently be dangerous as defined in Section 1175.1 of this title.

Nolen was examined as ordered and a competency hearing was held on October 26 and 27 of 2015. This competency hearing focused on whether Nolen was incompetent to stand trial due to mild intellectual disability.

¶63 The primary witness for the defendant at the competency hearing was Dr. Jeanne Russell who testified that she interviewed Nolen a cumulative total of seven hours on May 28, 2015 and June 30, 2015. During her time with Nolen, she administered four different tests. She testified that she administered the FIT-R, a standardized test to evaluate competency - whether a defendant has a factual understanding of the proceedings and the ability to assist in his defense. She concluded from the administration of this test that Nolen was aware of his arrest and the charges against him but he was confused about the roles of the officers of the court and he distrusted his attorneys. He wanted the death penalty and was not willing to participate in his defense.[21]

¶64 Dr. Russell also administered another standardized competency evaluation, the ECSR-R. During the administration of this test, Nolen insisted that he wanted the death penalty and he stated his intent to refuse to work with his attorneys on a different outcome. He was again unclear about the roles of the officers of the court.

¶65 Similar to her testimony during Nolen's intellectual disability trial discussed above in Proposition One, Dr. Russell testified that she administered the WASI-II, an IQ screening test, and the WAIS-IV, a full IQ test, and combined both to determine an overall IQ score of 69.[22] She also testified that in order to assess Nolen's adaptive functioning, she administered the Vineland II and reached her conclusions after speaking with Nolen's sister, Paige Nolen, and reviewing existing school records. Dr. Russell testified that Nolen scored low in the three main areas of communication, daily living skills, and social skills.[23] Dr. Russell noted at this hearing that the most difficult prong of intellectual disability to diagnose in Nolen's case is the requirement that the significant limitations in adaptive functioning manifest before the age of eighteen. She testified about limitations and behavior observed in Nolen before the age of eighteen -- such as academic performance -- but she did not address this prong in detail.

¶66 Dr. Russell concluded her testimony at this competency hearing by answering the questions required in the district court's order. With regard to the first two questions she testified that Nolen understood the charges against him but was not able to consult with the lawyer and rationally assist in the preparation of his defense; he was "unable or unwilling to consult with counsel." She added, "whether he has the capacity to do so is difficult to say; but, in my opinion, he lacks the capacity to plan his legal strategies and work with a lawyer in doing that." She found this, in part, because of his communication and higher reasoning limitations. She also based her opinion in part on his refusal to talk about any defense. Dr. Russell testified in response to question three that although Nolen's IQ score was low, she believed it possible that he could attain competency within a reasonable amount of time. She was not sure that this was possible but she testified that, "it would be worth a try." With regard to the fourth question, Dr. Russell testified that Nolen was not a person requiring treatment as defined by Section 1-103 of Title 43A because he was not showing symptoms of psychosis or mental illness requiring hospitalization. In answer to question five, Dr. Russell testified that Nolen was incompetent because of major deficits in his intellectual functioning based upon the results of the IQ tests and the adaptive functioning test. Question six was inapplicable because of the answers to questions four and five. Finally, in answer to question seven, Dr. Russell testified that Nolen was not presently dangerous as defined in Section 1175.1.

¶67 Dr. Shawn Roberson, a forensic psychologist, was the State's expert witness at the first competency hearing. Dr. Roberson testified that he evaluated Nolen on April 6, 2015, pursuant to the district court's order of March 25, 2015. In preparing for the evaluation, Dr. Roberson reviewed the case information. He testified that there was not an extensive amount of information available in Nolen's case but he noted that although Nolen had a criminal history with multiple prior convictions, there were no records indicating that competency had been an issue in the past. Dr. Roberson also testified that Nolen was not currently on any medication or receiving any treatment.

¶68 Dr. Roberson interviewed Nolen at the Cleveland County Detention Center. During the interview Nolen was generally cooperative but made it clear that he was not happy that his competency was challenged. From his examination, Dr. Roberson was able to answer the questions required by the court's order.

¶69 In response to the first question, Dr. Roberson testified that Nolen was able to appreciate the nature of the charges against him; Nolen knew that he was charged with murder and assault for beheading a woman at Vaughn Foods and cutting another woman's throat. In addition to understanding the crimes charged, Nolen knew that he was facing the punishment of the death penalty or life in prison.

¶70 With regard to the second question, Dr. Roberson testified that Nolen was able to consult with his attorneys and rationally assist in the preparation of a defense. He noted, however, that while Nolen was able to assist his attorneys, he was not willing to do so. Dr. Roberson testified that the issue was whether Nolen had any impairment, mental illness, cognitive deficit, or other medical condition that would preclude him from rationally assisting his attorney or making decisions about how to proceed in the case. He testified that Nolen's decision-making was not delusional or the result of a mental impairment. Dr. Roberson testified that if Nolen wanted to, he could assist his attorneys as he was able to articulate circumstances he believed mitigated his case; he believed he had been mistreated at work. He also could compose his behavior in court and he knew how he was expected to act; Nolen told Dr. Roberson that as long as no one offended him he would act appropriately. Dr. Roberson added that Nolen acted appropriately throughout the interview.

¶71 Dr. Roberson testified that because Nolen was able to appreciate the nature of the charges and to consult with and rationally assist in the preparation of a defense, question three was inapplicable.

¶72 With regard to question four, Dr. Roberson testified that Nolen was not a person requiring treatment as defined by Section 1-103 of Title 43 as there was no indication that Nolen had a history of mental health treatment or serious mental illnesses. Dr. Roberson noted that Nolen denied having any symptoms associated with serious mental illness and "didn't exhibit any signs that would be associated with a severe mental illness that would require his commitment to a psychiatric facility."

¶73 In response to question five, Dr. Roberson testified that "there was absolutely no data to suggest that Mr. Nolen had mental retardation."[24] He added that if he had a concern about intellectual disability, he would have noted it in his report and still have found Nolen to be competent because, "[you] can have mild intellectual [ ] disability and still be competent."

¶74 Finally, Dr. Roberson testified that question six was inapplicable and, with regard to question seven, he found that Nolen was not presently dangerous due to mental illness.

¶75 When asked about the variance between his assessment and Dr. Russell's, Dr. Roberson questioned Dr. Russell's administration of the IQ tests, opining that it was flawed. He questioned Nolen's effort in taking the IQ test and he opined that Dr. Russell scored Nolen low because he provided answers based upon his ideology rather than giving answers Dr. Russell would have considered appropriate. With regard to Dr. Russell's conclusions regarding Nolen's adaptive functioning, Dr. Roberson noted that Dr. Russell derived the bulk of her information from Nolen's sister who, Dr. Roberson opined, may not have given accurate information; the results are "completely dependent upon the accuracy of the informant." While acknowledging Nolen's largely poor academic performance, Dr. Roberson noted that Nolen performed better academically in early elementary school and that he got a few As in college courses. He testified that one would not expect an individual functioning as poorly as Dr. Russell reported to outperform peers to that degree in early elementary school or to earn an A in a college psychology course. Dr. Roberson testified that he found no legitimate evidence that Nolen was intellectually disabled. Nolen was, he concluded, competent to stand trial.

¶76 The district court ruled on the competency hearing in a Summary Order issued on October 28, 2015. The district court first noted that 22 O.S.2011, § 1175.4 presumes that persons are competent and when a defendant places his competency in question he has the burden of proving incompetency by a preponderance of the evidence. The district court also noted that the only disputed issue before the court was whether Nolen had presented sufficient evidence that he was "not competent due to mental retardation that would prohibit [him] from providing meaningful assistance in his defense." The district court found that under the preponderance of the evidence standard, the defense had shown both an IQ score of seventy or below and that evidence of sub-average intellectual functioning occurred before the age of eighteen.[25] The district court concluded, however, that the defense did not show by a preponderance of the evidence that Nolen "possessed any of the requisite cognitive/adaptive skill deficits set forth in the statute." The court concluded that "[b]ased on the totality of the evidence, it is clear that he does not." The district court concluded that Nolen did not present evidence meeting the statutory definition of mental retardation and noted evidence indicating his understanding of the charges and his ability to assist in his defense. The district court found that Nolen was competent to undergo further criminal proceedings in the matter. The district court's ruling is supported by the record and was not an abuse of discretion.

Competency Related to Mental Illness

¶77 Formal arraignment was held on February 11, 2016. At this proceeding, Nolen was communicative and answered the questions asked by the trial court.[26] Defense counsel voiced concern that Nolen did not understand or know of all of the counts charged so the Information was read aloud. Nolen denied past mental illness and stated that he understood the charges and consequences. Nolen expressed an intent to plead guilty but defense counsel argued that Nolen was not competent to enter a plea. The trial court entered a formal plea of not guilty and set the matter for a dispositional hearing.

¶78 The dispositional hearing was held on August 12, 2016. The defense called two witnesses to testify at this hearing. The first witness, Robert Hunt, held a master's degree in theology. He testified that Nolen's beliefs regarding Islam were not coherent and rational. The second witness for the defense was Dr. Antoinette McGarrahan, a psychologist specializing in forensic psychology and neuropsychology. Dr. McGarrahan testified that she evaluated Nolen to see if he understood the nature and consequences of entering a guilty plea. She spent nine hours with Nolen over two days during which she administered thirteen tests gauging a range of abilities from attention and concentration to cognitive control and verbal fluency. She also tested Nolen for malingering and concluded that he was not.[27]

¶79 During the time she spent with Nolen, Dr. McGarrahan noted that his thought process was rambling and incoherent. She testified that he was at times internally distracted, a sign of possible hallucinations. She found him to be delusional and out of touch with reality, displaying paranoid beliefs. Dr. McGarrahan testified that Nolen's intellectual capacity was obscured by mental illness. She concluded that Nolen suffered unspecified schizophrenia spectrum and other psychotic disorders that prevented him from having a rational understanding of the proceedings and being able to rationally comprehend and appreciate the consequences of his decision in waiving his rights.

¶80 Dr. Shawn Roberson was the State's primary expert witness at the disposition hearing. Dr. Roberson testified that in order to assess Nolen's competence as required by the court, he reviewed Dr. McGarrahan's report, transcripts of the formal arraignment, and an earlier dispositional hearing, and he re-examined Nolen at the Cleveland County Detention Center. Dr. Roberson noted that none of the tests administered by Dr. McGarrahan were relevant to assessment of mental illness; they all measured cognitive abilities. In contrast, Dr. Roberson testified that he administered the Symptoms Checklist 90-revised (SCL-90-R), a self-reported measure of psychopathology. Based upon this assessment, Dr. Roberson concluded that Nolen was not endorsing any significant psychological problems. He also disagreed with Dr. McGarrahan's conclusion that Nolen was not malingering giving far more credence to the TOMM malingering assessment.

¶81 Dr. Roberson testified that his conclusions regarding the test results were corroborated by his observations during the clinical interview. Nolen was not symptomatic and he observed nothing indicative of a thought disorder. Dr. Roberson testified that Nolen was able to engage in coherent conversation. Dr. Roberson opined that Nolen was not delusional, schizophrenic, or even necessarily malingering -- he was just not cooperating. He concluded, "I do not believe that he has any severe cognitive disability, and I do not see any mental illness. I think this is strictly personality and his volitional choice that he is uncooperative with the Court and his attorneys."

¶82 At the conclusion of the dispositional hearing, on August 17, 2016, the trial court noted that competency is a fluid issue and prior rulings are not necessarily dispositive of the current circumstance. The trial court acknowledged the presumption of competence but also that the court still had doubts. While the trial court leaned toward the conclusion that Nolen's decision not to cooperate was volitional, given the gravity of the proceeding, the trial court declined to accept Nolen's guilty plea without further inquiry. The proceeding was stayed pending a competency evaluation and a post-evaluation hearing.

¶83 The three day competency trial commenced on April 3, 2017. Several witnesses for the defense were individuals who worked at the Oklahoma Forensic Center (OFC) in Vinita in different capacities and who observed Nolen while he was there. While some testified that Nolen displayed aggressive behavior while at OFC and was medicated to reduce his aggression, several testified that Nolen displayed no signs of mental illness. Brooke Harboe, a pre-doctoral psych intern who performed the intake screen, testified that although it was not an in depth evaluation she noted that Nolen demonstrated cognitive disorganization and pervasive religious thoughts.

¶84 The first expert witness for the defense was Dr. Moira Redcorn, a psychiatrist at OFC. Dr. Redcorn testified that Nolen was at OFC for observation and evaluation, not diagnosis. While there, she interviewed Nolen and performed a psychiatric evaluation of him. She noted that he denied depression but had some symptoms.[28] He also presented symptoms of mania including distractibility, grandiose thoughts, flight of ideas, and talkativeness. Dr. Redcorn said that these were possible symptoms of mental illness, but the most prominent symptom of mental illness displayed by Nolen was disorganized speech. She noted additionally, with regard to the disorganized speech, that he could be malingering.

¶85 While Dr. Redcorn testified that the objective upon Nolen's admission to OFC was to rule out psychosis and post-traumatic stress disorder, she was unable to establish a discharge diagnosis due to his short stay and resistance to answering questions. Dr. Redcorn agreed that it was not necessary to rule out PTSD, psychosis, or any mental illness to determine competency; she stated, "You can be mentally ill and be found competent."

¶86 Dr. Antoinette McGarrahan also testified for the defense. Because Nolen would not communicate with her during her most recent attempts to evaluate him, she relied upon her prior evaluation and several other sources in reaching her conclusions. These included Cleveland County Detention Center records, OFC records including reports by Dr. Redcorn and Ms. Harboe, and reports written by Dr. Orth, a forensic psychologist with the Department of Mental Health and Substance Abuse Services who was currently the Director of Psychology at OFC. Dr. McGarrahan testified that Nolen's distractibility, flight of ideas, paranoia, grandiosity, verbal and physical aggression, agitation, and hostility were consistent with mental illness. She also ruled out malingering because Nolen did not want to be seen as mentally ill.

¶87 In answer to the seven statutory questions regarding competency, Dr. McGarrahan testified that Nolen is not able to appreciate the nature of the charges against him. Nolen, she said, does not appreciate "the charges, the basis for the charges, the consequences, the court proceedings, and what rights he would be waiving by making a plea of guilty." She testified that he does not understand the defenses available and he cannot consult with his lawyer and rationally assist in the preparation of a defense. His paranoia, hostility, and aggression, she testified, preclude him from engaging rationally with anyone, "particularly defense counsel." Dr. McGarrahan testified that Nolen is a person requiring treatment as defined by Section 1-103 of Title 43A of the Oklahoma statutes and that if treated and monitored he could attain competency. Dr. McGarrahan testified that she did not evaluate Nolen for mental retardation as it was not relevant to this proceeding. Finally, she found that Nolen was presently dangerous. Dr. McGarrahan concluded that Nolen suffers from severe mental illness that renders him incompetent.

¶88 The State responded with the testimony of two expert witnesses. Dr. Shawn Roberson testified first. He reviewed the competency evaluation reports issued by other psychologists in light of his own earlier competency evaluation. Dr. Roberson noted that defense expert Dr. Russell opined after examining Nolen that he did not have severe mental illness or meet inpatient criteria; Dr. Russell's concern was the potential of intellectual disability. Dr. Roberson testified that his conclusions were highly similar to those of Dr. Orth as neither noted signs of mental illness or cognitive impairment.

¶89 In addressing Dr. McGarrahan's report, Dr. Roberson noted that Dr. McGarrahan omitted consideration of parts of other reports that did not comport with her conclusions. For instance, Dr. McGarrahan discounted Dr. Redcorn's concern that Nolen might be malingering. She also discounted Ms. Harboe's notations that Nolen was within the average range of functioning; he appeared coherent and logical and gave appropriate responses to questions other than religion. Dr. Roberson testified that Dr. McGarrahan did not test Nolen for mental illness or psychopathology; she gave a battery of cognitive tests. Dr. Roberson noted that prior to the previous summer, there was no indication that anyone thought Nolen had severe mental illness and he disagreed with Dr. McGarrahan's diagnosis of mental illness. Dr. Roberson testified:

I don't think that Alton Nolen has a severe mental illness. I don't think there is any evidence to suggest that that's accurate. I think that his behavior that [Dr. McGarrahan] interprets as being signs of mental illness is unresponsiveness, uncooperativeness; but it gets characterized as disorganization and paranoia. Pauses in responding get characterized as hallucinations.

Dr. Roberson found Nolen to be competent.

¶90 The State's second expert witness was Dr. Scott Orth who testified that he performed a competency evaluation on Nolen pursuant to the court's order. During his first encounter with Nolen, Nolen did not open his eyes and said that he had already answered the questions and had nothing more to say. Nolen did, however, mention his religion; he said that he was not trying to be rude but it was against his religion to "play along" with someone who was trying to "impeach" him with "having a mental problem." Dr. Orth believed that Nolen's decision not to answer questions he believed he had already answered was a rational decision.

¶91 Dr. Orth was not able to adequately answer the court's questions based upon this initial evaluation so he looked elsewhere for information. He checked with the medical record departments of state-operated mental health facilities and found no history for Nolen.

¶92 In November of 2016, Nolen spent about two weeks at OFC for observation and evaluation. During this time, Dr. Orth was able to visit with and observe Nolen, and form an opinion regarding his competency. Nolen demonstrated a capacity to talk about the specific charges against him. He interjected religion into almost every statement but Dr. Orth did not feel this was a product of mental illness; Nolen just liked to talk about religion. Dr. Orth did not observe signs of paranoia or suspiciousness. When Dr. Orth spoke with Nolen, Nolen was calm and cordial. Dr. Orth observed no concentration or focus impairments problematic for adjudicative competence; Nolen's intellectual functioning was within the average range. Dr. Orth did not find Nolen to display disorganized or delusional thinking; his religious fixation was more akin to an overvalued belief.

¶93 Dr. Orth testified that Nolen was able to appreciate the nature of the charges against him; he suffered no major mental illness or cognitive impairment that would affect his ability to understand the charges, the plea form or the questions the court might ask. Dr. Orth also testified that Nolen was able to consult with a lawyer and rationally assist in the preparation of a defense; Nolen could do those things if he chose to do so. Dr. Orth testified that Nolen did not actually have any mental illness; any difficulty he was experiencing was the result of the way he chose to behave. Nolen, he believed, was competent.

¶94 At the close of the competency hearing, the trial court noted again the presumption of competence. The trial court stated that while the facts were not in dispute -- Nolen's behavior was bizarre and his beliefs unconventional -- conclusions drawn from the facts by the experts conflicted. The trial court noted Nolen's burden of proof to show that he was more likely than not incompetent, and the court concluded that in light of the varying testimony, the defense failed to meet their burden of proof. We do not find on this record that the trial court's ruling was an abuse of discretion.

Competency to Assist in Appeal

¶95 Defense counsel asserts that Nolen is presently incompetent and cannot communicate or rationally assist in presenting his appeal to this Court. Counsel contends that while much has been accomplished without Nolen's assistance, appellate counsel has no way of knowing about information Nolen may have that could possibly assist in his appeal. Accordingly, defense counsel filed, contemporaneously with Nolen's brief in chief, an application for evidentiary hearing under Rule 3.11(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2021) on the issue of his present competency.

¶96 As noted in the State's reply, it is well settled that a defendant must be competent to stand trial, enter a guilty or nolo contendre plea, or abandon his appeal. Fisher v. State, 1992 OK CR 79, ¶ 14, 845 P.2d 1272, 1276. In Fisher, we rejected the defendant's argument urging this Court to extend the requirement of present competency to appellate proceedings. Id. Accordingly, this Court held that Fisher was not entitled to an evidentiary hearing on the issue of his competency to assist in his appeal. Id. 1992 OK CR 79, ¶ 17, 845 P.2d at 1277. Nolen has neither cited authority to the contrary nor offered persuasive argument. We deny his request for an evidentiary hearing on the issue of his present competency.

3. Voir Dire -- For Cause Challenges

¶97 Nolen argues that the trial court committed reversible error when it denied defense counsel's request to remove three prospective jurors for cause. This Court has held that, "[i]n order to properly preserve for appellate review an objection to a denial of a challenge for cause, a defendant must demonstrate that he was forced over objection to keep an unacceptable juror." Eizember v. State, 2007 OK CR 29, ¶ 36, 164 P.3d 208, 220 (citing Browning v. State, 2006 OK CR 8, ¶ 8, 134 P.3d 816, 828). "This requires a defendant to excuse the challenged juror with a peremptory challenge and make a record of which remaining jurors the defendant would have excused if he had not used that peremptory challenge to cure the trial court's alleged erroneous denial of the for cause challenge." Id. Nolen preserved the issue as he used his peremptory challenges to strike the three prospective jurors he asked to remove for cause. He also advised the trial court of four other "unacceptable" prospective jurors he would have excused with peremptory challenges had he not been forced to used them on the prospective jurors that the trial court would not excuse for cause.

¶98 The decision of whether to disqualify a prospective juror for cause lies within the sound discretion of the trial court. Mitchell v. State, 2010 OK CR 14, ¶ 19, 235 P.3d 640, 647 (citing Grant v. State, 2009 OK CR 11, ¶ 24, 205 P.3d 1, 13). The trial court's decision will not be overturned absent a finding of an abuse of discretion. Id.

¶99 A critical part of the constitutional right to an impartial jury is "an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 729 (1992). "The purpose of voir dire examination is to discover whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges." Harmon v. State, 2011 OK CR 6, ¶ 7, 248 P.3d 918, 927 (citing Sanchez v. State, 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997). The United States Supreme Court has held that the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985) (internal quotations omitted). See also Tryon v. State, 2018 OK CR 20, ¶ 28, 423 P.3d 617, 630; Jones v. State, 2009 OK CR 1, ¶ 14, 201 P.3d 869, 877.

¶100 This Court has recognized the Witt requirement that jurors be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment with the possibility of parole. Tryon, 2018 OK CR 20, ¶ 28, 423 P.3d at 630. See also Johnson v. State, 2012 OK CR 5, ¶ 30, 272 P.3d 720, 730 ("Due process of law requires that a prospective juror be willing to consider all the penalties provided by law and not be irrevocably committed to a particular punishment before the trial begins." (quoting Sanchez, 2009 OK CR 31, ¶ 44, 223 P.3d at 997). Further, while doubts regarding juror impartiality must be resolved in favor of the accused, this Court looks to the entirety of each potential juror's voir dire and gives deference to the ruling of the trial court because, "the trial judge is in a position to personally observe the panelists, and take into account a number of non-verbal factors that cannot be observed from a transcript." Johnson, 2012 OK CR 5, ¶ 30, 272 P.3d at 730 (citing Harmon, 2011 OK CR 6, ¶ 18, 248 P.3d at 929-30). See also Uttecht v. Brown, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."); Eizember v. Trammell, 803 F.3d 1129, 1135 (10th Cir. 2015) ("the trial judge is best positioned to determine whether a potential juror will be able to follow his or her instructions-and that a court of appeals removed from the live proceedings must afford significant deference to the trial judge's assessments").

Prospective Juror C.D.

¶101 Nolen first complains that the trial court erred in denying his request to remove prospective juror C.D. for cause because C.D. could not consider imposing either life without parole or life with the possibility of parole. Nolen notes that while C.D. initially indicated that he could consider all three sentencing options and he would not automatically impose the death penalty, C.D. indicated during defense counsel's voir dire that he would not consider a "straight life sentence." Nolen complains that C.D. was inconsistent regarding whether he could meaningfully consider a sentence of life or life without the possibility of parole. In addressing Nolen's argument, it is important to give context to C.D.'s statements during voir dire.

¶102 At the opening of the death qualifying portion of the voir dire, the trial court explained to the prospective jurors that as to the first degree murder charge, there were three punishment options. The court explained aggravating and mitigating circumstances and that "you may not consider imposing the death penalty unless you unanimously find the aggravating circumstances outweigh any mitigating circumstances which may be present." When C.D. was questioned by defense counsel, C.D. indicated he would not impose a straight life sentence in a situation where there was at least one aggravating circumstance that made the murder "really, really bad." However, the trial court asked defense counsel to approach the bench and admonished her for "setting up cause objections without providing all of the information." The court admonished counsel that inquiry about C.D.'s ability to consider mitigating circumstances should be made as well. When presented with the scenario in which the State proved at least one aggravating circumstance and the defense presented evidence of a mitigating circumstance, C.D. stated that he would consider the evidence with an open mind. C.D. stated, "So I don't take it lightly, you know, I'm open to all of those forms of punishment. If it were me on the other side, I would want everyone to treat my case the same way."

¶103 When the voir dire of C.D. is reviewed in its entirety, it does not support Nolen's argument that C.D. had a strong bias in favor of the death penalty and an inability to consider the other punishment options of life imprisonment and life without the possibility of parole. Any inconsistencies in C.D.'s responses or questions as to his ability to be a fair and impartial juror were for the trial court to resolve. Having the benefit of observing C.D.'s demeanor throughout voir dire, the court found his responses credible and insufficient to excuse him for cause. Our review of the totality of voir dire, written and oral responses, supports the trial court's finding that C.D. did not have such a strong bias towards the death penalty that the performance of his duties as juror would be prevented or substantially impaired. Accordingly, the trial court did not abuse its discretion in refusing to remove C.D. for cause.

Prospective Juror A.E.

¶104 Next Nolen argues that the trial court erred in denying his request to remove prospective juror A.E. for cause because A.E. could not consider imposing a sentence of life with the possibility of parole and because she had significant media exposure before the beginning of trial. Because defense counsel requested below only that A.E. be removed for cause based upon her inability to fairly consider the sentencing option of life with the possibility of parole, Nolen's complaint on appeal that A.E. should have been removed for cause based upon her media exposure will be reviewed for plain error only. See Tryon, 2018 OK CR 20, ¶ 26, 423 P.3d at 630.

¶105 Nolen argues that A.E. should have been dismissed for cause because the media exposure caused her to question her safety during the course of the proceedings. It is true, as Nolen asserts, that A.E. stated in voir dire that she worked across the street from Vaughn Foods at the time of the incident and that she followed it on the news. However, she agreed that she could set aside what she had heard and listen to the facts. It is also true that A.E. expressed concern for her safety as a juror given the media coverage of the case. The trial court addressed this concern and assured A.E. that with the sheriff's department and the police department the court would assure the safety of the jurors. When asked about this concern by defense counsel later during general voir dire, A.E. stated that the trial court had put her concerns to rest. The record does not show A.E.'s prior media exposure or safety concerns would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath. There was no error, plain or otherwise, in the trial court's failure to remove A.E. for cause based upon her media exposure or safety concerns.

¶106 Next, Nolen complains that the trial court abused its discretion in declining defense counsel's request to remove A.E. for cause based upon her strong bias against the punishment option of life with the possibility of parole. During the death qualifying portion of voir dire, after A.E. stated that she could consider all three punishment options, she added that it would be hard for her to recommend life with the possibility of parole, "especially if it was decided that all of the facts were there." When questioned by the trial court, A.E. reaffirmed that she could imagine circumstances under which a sentence of life with the possibility of parole would be appropriate. After the significance of aggravating circumstances and mitigating circumstances was explained to the prospective jurors, A.E. confirmed, again, that she could leave all three punishment options on the table until after she heard all of the evidence. When, at the end of the death qualifying voir dire, defense counsel moved to strike A.E. for cause based upon her inability to fairly consider recommending a life sentence, the trial court denied this request. Based on the record, we find that the trial court's ruling was not an abuse of discretion. The record does not show A.E.'s views on the life imprisonment sentencing option would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath.

Prospective Juror L.L.

¶107 Finally, Nolen complains that prospective juror L.L. should have been removed for cause based upon his belief that the death penalty should be automatically imposed in first degree murder cases. L.L. originally indicated in the death qualifying portion of voir dire that he could consider all three punishment options. However, Nolen notes that when questioned by defense counsel, L.L. indicated that he supports imposition of the death penalty in first degree murder cases where the killing was intentional. This belief, he argues, rendered L.L. substantially impaired and unable to fairly consider all three punishment options.

¶108 The record shows that L.L. was initially quite adamant that he could give meaningful consideration to all three punishment options. He agreed that everything was on the table and he reaffirmed more than once that he could give meaningful consideration to all three punishment options. While L.L. stated that the death penalty would be appropriate punishment for premeditated murder, he clarified, when asked by the trial court, that he could consider all three punishment options. When defense counsel requested that L.L. be removed for cause, the trial court declined, finding that L.L.'s responses did not show him to be substantially impaired; he could consider all three punishment options. The record supports the trial court's ruling and we find no abuse of discretion. This proposition is without merit and relief is not required.

4. Voir Dire Restrictions

¶109 Nolen argues that he was denied his right to select a fair and impartial jury due to restrictions placed on defense counsel's questioning of prospective jurors by the trial court. "The manner and extent of voir dire is within the discretion of the trial court whose rulings will not be disturbed on appeal absent a clear abuse of discretion." Mitchell, 2010 OK CR 14, ¶ 10, 235 P.3d at 646 (citing Eizember, 2007 OK CR 29, ¶ 67, 164 P.3d at 228).

¶110 Nolen specifically complains that defense counsel was precluded from asking prospective jurors questions designed to reveal juror bias regarding the insanity defense. The record shows that during voir dire, defense counsel asked four prospective jurors whether they believed that, "somebody can do something because of mental illness or insanity and not know what they were doing was wrong?" The first three prospective jurors answered the question affirmatively. When the question was posed to a fourth prospective juror, it was met with objection by the State on the ground that defense counsel was improperly testing the theory of defense to see if the jurors would be amenable to it. Defense counsel responded that she was not testing the theory of the case but rather inquiring to determine whether the prospective jurors could consider the defense of not guilty by reason of insanity. The trial court sustained the State's objection and Nolen complains on appeal that this ruling was in error.

¶111 The United States Supreme Court has held that, "[i]n essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). See also Harmon, 2011 OK CR 6, ¶ 7, 248 P.3d at 927 ("The purpose of voir dire examination is to discover whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges."). This guarantee includes the right to be tried by jurors who are capable of putting aside their personal impressions and opinions and rendering a verdict based solely on the evidence presented in court. Voir dire is a vehicle for ensuring this right, as it "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." Mu'Min v. Virginia, 500 U.S. 415, 431 (1991). Thus, in voir dire, a "suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." Id. at 422 (quoting Connors v. United States, 158 U.S. 408, 413 (1895)).

¶112 However, voir dire is not without limitations. The trial court may restrict counsel from asking questions that are repetitive, irrelevant or which regard legal issues upon which the trial court will subsequently instruct the jury. Harmon, 2011 OK CR 6, ¶ 7, 248 P.3d at 927. This Court has held that while a defendant is entitled to a voir dire that fairly and adequately probes a juror's qualifications, a defendant is not necessarily entitled to test the prospective jurors on their capacity to accept his theory of the case. Robinson v. State, 2011 OK CR 15, ¶ 16, 255 P.3d 425, 431-32 ("An attorney should not use voir dire to test prospective jurors' willingness to accept a party's theory of the case, rather than the jurors' impartiality.").

¶113 In the present case, the questions asked by defense counsel regarding insanity were not designed to discern whether the prospective jurors could apply the law on the theory of the defense of insanity as their oath required but rather, whether they were open to accepting Nolen's theory of defense. In ruling on the State's objection to defense counsel's questions regarding insanity, the trial court stated, "I think you've gone far enough. I think you've put it out there. I'm going to sustain the objection. I don't know of any authority that allows you to test your -- either theory of the case, whether that's a defense or plea." As the State points out, the trial court's ruling on this particular question did not preclude defense counsel from asking questions about mental illness - which was discussed at length - or even from asking different questions about insanity; defense counsel was not precluded from asking whether prospective jurors could consider an insanity defense if they were so instructed. This single restriction on voir dire was not an abuse of discretion and did not operate to deny Nolen a fair trial by a panel of impartial jurors. This proposition is denied.

5. Admission of Gruesome Photographs

¶114 Nolen challenges the trial court's admission into evidence of four photographs he characterizes as gruesome, shocking, and disturbing.[29] Defense counsel objected to the admission of State's Exhibits 102, 104, and 108, both in a pre-trial motion in limine and again at trial. Accordingly, we review the trial court's ruling on the admissibility of these photographs for an abuse of discretion. Tryon, 2018 OK CR 20, ¶ 56, 423 P.3d at 636. Unless a clear abuse of discretion is shown reversal will not be warranted. Horn v. State, 2009 OK CR 7, ¶ 41, 204 P.3d 777, 787. Because State's Exhibit 193 was not met with objection at trial we review the admission of this photograph for plain error.[30] See Williams v. State, 2008 OK CR 19, ¶ 69, 188 P.3d 208, 223. Such error must be plain and obvious and must affect the defendant's substantial rights. Lee v. State, 2018 OK CR 14, ¶ 4, 422 P.3d 782, 785. We reverse only where the error "seriously affects the fairness, integrity or public reputation of the judicial proceedings." Id. See also Hogan v. State, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923.

¶115 It is well established that gruesome crimes make for gruesome photographs. Cole v. State, 2007 OK CR 27, ¶ 29, 164 P.3d 1089, 1096. This alone will not render them inadmissible "as long as they are not so unnecessarily hideous or repulsive that jurors cannot view them impartially." Bosse v. State, 2017 OK CR 10, ¶ 48, 400 P.3d 834, 853. See also Stouffer v. State, 2006 OK CR 46, ¶ 109, 147 P.3d 245, 268. The State is "not required to downplay the violence involved or its repercussions." Tryon, 2018 OK CR 20, ¶ 63, 423 P.3d at 637 (quoting Jones, 2009 OK CR 1, ¶ 57, 201 P.3d at 885). The test for admissibility of photographs, however, is not whether they are gruesome but whether they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. 12 O.S.2011, §§ 2402, 2403. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 12 O.S.2011, § 2401.

¶116 Nolen argues that the photographs at issue in the present case had very little relevance considering that the cause of death and identity of the perpetrator were never contested. Thus, he complains that the photographs should have been excluded because any minimal probative value they may have had was substantially outweighed by the danger of unfair prejudice -- their tendency to elicit an emotional, rather than a rational, reaction.

¶117 While the trial court did not detail the reasons for its ruling on the admissibility of photographs at trial, it did so when the issue was addressed prior to trial. The trial court reviewed the photographs with counsel, sustaining defense counsel's objection to some photographs and overruling it as to others. Where photographs were duplicative, the trial court asked the prosecutor to pick one and excluded the others. The trial court noted that State's Exhibits 102, 104, and 108, which were taken at the crime scene, were relevant because they depicted the entirety of the injuries suffered by Ms. Hufford, including defensive wounds. The trial court also noted that the photograph taken at the medical examiner's office, State's Exhibit 193, showed that the serrated knife matched injuries to Ms. Hufford's chin.

¶118 The photographs at issue were relevant as they depicted the victim and crime scene, they illustrated the nature and extent of the wounds, and they corroborated the eyewitness testimony. While gruesome, the probative value of these photographs, considered both individually and collectively, was not substantially outweighed by their prejudicial effect. The trial court did not abuse its discretion in admitting the crime scene photographs into evidence. Furthermore, the admission of the cropped photograph taken at the medical examiner's office was not error, plain or otherwise. Relief is not required.

6. Admission of Pre-Mortem Photograph

¶119 Nolen argues that the admission of a pre-mortem photograph of Colleen Hufford during first stage of trial violated his due process rights to a fundamentally fair trial and injected passion, prejudice, and other arbitrary factors into the sentencing proceedings. Because defense counsel objected to the admission of this photograph below, we review the trial court's ruling on its admissibility for an abuse of discretion. Bosse, 2017 OK CR 10, ¶ 52, 400 P.3d at 854. Again, absent a finding of a clear abuse of discretion, reversal is not warranted. Horn, 2009 OK CR 7, ¶ 41, 204 P.3d at 787.

¶120 Oklahoma law allows admission of a pre-mortem photograph to show the general appearance and condition of the victim while alive. Goode v. State, 2010 OK CR 10, ¶ 56, 236 P.3d 671, 682. Title 12 O.S.2011, § 2403 specifically provides that "in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive." Nolen notes that constitutional challenges to this language have been raised and addressed before and that this Court has "attempted to save this legislative act from unconstitutionality by continuing to subject such photos to balancing of prejudice versus probative value...." Indeed, this Court has rejected challenges to the constitutionality of this statutory provision and found that the statute does not afford "blanket admissibility" of such photographs because only one "appropriate" in-life photograph is allowed and that photograph is subject to the balancing test set forth in Section 2403. Hogan, 2006 OK CR 19, ¶¶ 62-64, 139 P.3d at 93-31. See also Bosse, 2017 OK CR 10, ¶¶ 52-53, 400 P.3d at 854. As in the past, Nolen's argument does not overcome the presumption that legislative acts are constitutional. See Glossip v. State, 2007 OK CR 12, ¶ 78, 157 P.3d 143, 156-57.

¶121 Nolen also claims that pre-mortem photographs have no relevance to any issue in the second stage of trial, and the introduction of the in-life photograph served no purpose other than to elicit sympathy for the victim. We rejected this claim in Malone v. State, 2007 OK CR 34, ¶¶ 85-86, 168 P.3d 185, 218-19, holding that, "in capital cases, in particular, it is constitutional to allow the sentencing jury an actual 'quick glimpse' of the person who later became the victim in the case--before he or she was reduced to the corpse shown in crime scene photographs--through the admission of an 'appropriate photograph of the victim while still alive.'" Nolen has not persuaded us to find otherwise.

¶122 The photograph admitted in the present case was an appropriate snapshot of the victim, offered to show her general appearance and condition while alive in accordance with Section 2403. The probative value of the photograph was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in allowing this photograph into evidence and relief is not required. This proposition is without merit.

7. Constitutionality of Aggravating Circumstances

¶123 Nolen claims that three of the aggravating circumstances found by the jury failed to perform the narrowing function required by the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, and 20 of the Oklahoma Constitution. He argues that the aggravating circumstances at issue were not adequately defined in jury instructions to serve the narrowing function necessary for constitutional application of the death penalty. We have repeatedly rejected these arguments.

¶124 Nolen first complains that the great risk of death to more than one person aggravating circumstance is vague and failed to perform the necessary narrowing function. This Court has addressed and rejected constitutional challenges to this aggravating circumstance in the past. Bosse, 2017 OK CR 10, ¶ 72, 400 P.3d at 859-60; Wood v. State, 2007 OK CR 17, ¶ 26, 158 P.3d 467, 477. Nolen also complains that because there is no uniform jury instruction for this aggravating circumstance, the jury was not given proper guidance on how to apply it. This Court has rejected this argument holding that, a separate uniform jury instruction defining this aggravating circumstance is not necessary. Bosse, 2017 OK CR 10, ¶ 73, 400 P.3d at 860 ("the statutory language explaining this aggravating circumstance sufficiently informs jurors what is necessary to support a finding that it is present"). See also Eizember, 2007 OK CR 29, ¶¶ 137--139, 164 P.3d at 241 (noting that the statutory language is readily understandable). We see no reason to depart from these earlier rulings.

¶125 Nolen also complains that the continuing threat aggravating circumstance is unconstitutionally vague and fails to perform the necessary narrowing function. Nolen acknowledges that this Court has repeatedly rejected attacks on this aggravating circumstance through the years. Nonetheless, he argues that in light of "recent developments in capital punishment jurisprudence" this Court should re-examine our earlier holdings. Nolen makes this argument without citation to recent authority and without reference to more recent cases wherein this Court rejected this same argument. See, e.g., Goode, 2010 OK CR 10, ¶¶ 69-72, 236 P.3d at 684-85; Sanchez, 2009 OK CR 31, ¶ 81--94, 223 P.3d at 1006--11. Nolen has presented us no compelling reason to reevaluate this aggravating circumstance at this time.

¶126 Finally, Nolen challenges the constitutionality of the especially heinous, atrocious, or cruel aggravating circumstance arguing that it is vague and fails to perform the requisite narrowing function. This Court has rejected similar challenges to the constitutionality of this aggravating circumstance. See, e.g., Harris v. State, 2019 OK CR 22, ¶ 91, 450 P.3d 933, 965; Bench v. State, 2018 OK CR 31, ¶ 112, 431 P.3d 929, 961-62; Tryon, 2018 OK CR 20, ¶ 130, 423 P.3d at 652. The analysis and authorities presented by Nolen raise nothing new. We continue to find that the heinous, atrocious or cruel aggravating circumstance is not vague and that the instructions given regarding it sufficiently narrow its application. This claim is denied.

8. Prosecutorial Misconduct

¶127 Nolen complains prosecutorial misconduct deprived him of his right to a fair trial. The alleged misconduct not met with objection at trial is reviewed for plain error only. Bivens v. State, 2018 OK CR 33, ¶ 20, 431 P.3d 985, 994. Furthermore, we also review for plain error where objection on appeal is different than the objection made below. Bench, 2018 OK CR 31, ¶ 140, 431 P.3d at 967 (when a specific objection is made at trial, this Court will not consider a different one on appeal).

¶128 On plain error review, Nolen must show that the commission of a plain or obvious error affected the outcome of his trial. Nicholson v. State, 2018 OK CR 10, ¶ 9, 421 P.3d 890, 895. "This Court will correct plain error only where it seriously affects the fairness, integrity or public reputation of the proceedings." Id. "[W]e evaluate the alleged misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel." Hanson v. State, 2009 OK CR 13, ¶ 18, 206 P.3d 1020, 1028.

Eliciting Sympathy for the Victim

¶129 Nolen complains that the prosecutor elicited sympathy for the victim in both opening and closing arguments. This Court has indeed held that it is improper for the prosecutor to elicit sympathy for the victim from the jurors. Pullen v. State, 2016 OK CR 18, ¶ 14, 387 P.3d 922, 927. The single comment at issue in opening statement was not met with objection below. It occurred when the prosecutor described the victim as, "one of the most beautiful and caring ladies that you'll ever meet . . . ." This comment did not deprive Nolen of a fair trial or affect the jury's finding of guilt or assessment of punishment. There was no plain error here.

¶130 In first stage closing argument the prosecutor basically told the jury to not consider only the testimony of all the doctors, but to talk about Ms. Hufford and not forget about what happened to her. Defense counsel objected, complaining essentially that the prosecutor's argument was not relevant. As the objection on appeal is different than the objection made below, we review for plain error. Bench, 2018 OK CR 31, ¶ 140, 431 P.3d at 967. Both parties have the right to discuss the evidence from their respective standpoints and the prosecutor's comments fell within the wide range of acceptable argument. See Bland v. State, 2000 OK CR 11, ¶ 97, 4 P.3d 702, 728. The comments here were based on the evidence and not merely appeals for sympathy. The prosecutor's comments were not error, plain or otherwise.

Denigrating the Defense

¶131 Nolen argues that the same comments complained of above improperly denigrated the evidence supporting the insanity defense. He did not make this objection below. Nolen reads the prosecutor's comments as an attack on the defense of insanity, but we do not. The prosecutor was arguing the facts of the case, urging the jury to consider what Nolen had done to Hufford, and this was well within his discretion. Again, both parties have the right to discuss the evidence from their respective standpoints and the prosecutor's comments fell within the wide range of acceptable argument. See id. There was no error here, plain or otherwise.

Inflaming the Passions of the Jury

¶132 Finally, Nolen argues that the prosecutor unfairly inflamed the passions of the jury in closing argument when he compared the in-life photograph of the decedent with a gruesome crime scene photograph of her and stated, "Ladies and Gentlemen, he turned this into this. He turned this beautiful lady into this on the floor, this and this." This argument was not met with objection and is accordingly, reviewed only for plain error. This argument, and the use of properly admitted photographs, was a reasonable comment on the evidence. The contrasting of the two photographs did not render Nolen's trial fundamentally unfair. See Bench, 2018 OK CR 31, ¶¶ 148-50, 431 P.3d at 968-69. Relief is not required.

9. Cumulative Error

¶133 Nolen claims that even if no individual error in his case merits relief, the cumulative effect of the errors committed requires a new trial or favorable sentence modification. "The cumulative error doctrine applies when several errors occurred at the trial court level, but none alone warrants reversal." Tafolla v. State, 2019 OK CR 15, ¶ 45, 446 P.3d 1248, 1263. Although individual errors may be of insufficient gravity to warrant reversal, the combined effect of cumulative errors may require a new trial. Id. The commission of several trial errors does not deprive the defendant of a fair trial when the errors considered together do not affect the outcome of the proceeding. Id. There are no errors, considered individually or cumulatively, that merit additional relief in this case. This claim is denied.

10. Mandatory Sentence Review

¶134 Title 21 O.S.2011, § 701.13(C)(1)&(2) requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "[w]hether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." After conducting this review, this Court may order any corrective relief that is warranted or affirm the sentence. 21 O.S.2011, § 701.13(E).

¶135 Having reviewed the record in this case, we find that Nolen's death sentence was not the result of trial error or improper evidence or witness testimony and that the death sentence was not imposed under the influence of any arbitrary factor, passion or prejudice.

¶136 The jury's finding that Nolen (1) was previously convicted of a felony involving the use or threat of violence to the person; (2) knowingly created a great risk of death to more than one person; (3) that the murder was especially heinous, atrocious, or cruel; and (4) that there existed a probability that Nolen would commit criminal acts of violence that would constitute a continuing threat to society was amply supported by the evidence. Weighing the aggravating circumstances and evidence against the mitigating evidence presented, we find, as did the jury below, that the aggravating circumstances in this case outweigh the mitigating circumstances.

DECISION

¶137 The Judgment and Sentence of the District Court is AFFIRMED. The Application for an Evidentiary Hearing on Sixth and Fourteenth Amendment Claims is DENIED. Appellee's Motion for Leave to File Amended Brief of Appellee is GRANTED and the Clerk of this Court is ORDERED to file the tendered brief. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2021), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF CLEVELAND
COUNTY, THE HONORABLE LORI WALKLEY, DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL
 
 
 APPEARANCES ON APPEAL
 
 
 
 
 MITCHELL SOLOMON
 SHEA SMITH
 BENJAMIN BROWN
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P.O. BOX 1804
 NORMAN, OK 73101
 ATTORNEYS FOR DEFENDANT
 
 
 JAMES H. LOCKARD
 LYDIA ANDERSON FIELDS
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 ATTORNEYS FOR APPELLANT
 
 
 
 
 GREG MASHBURN
 DISTRICT ATTORNEY
 SUSAN CASWELL
 JOHN PEVEHOUSE
 ASSISTANT DISTRICT
 ATTORNEYS
 DISTRICT ATTORNEY'S
 OFFICE
 201 SOUTH JONES
 NORMAN, OK 73069
 ATTORNEYS FOR STATE
 
 
 MIKE HUNTER
 ATTORNEY GENERAL
 OF OKLAHOMA
 CAROLINE E.J. HUNT
 ASSISTANT ATTORNEY
 GENERAL
 JENNIFER L. CRABB
 ASSISTANT ATTORNEY
 GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 ATTORNEYS FOR APPELLEE
 
 
 

 

OPINION BY: ROWLAND, V.P.J.
KUEHN, P.J.: Concur
LUMPKIN, J.: Concur in Results
LEWIS, J.: Specially Concur
HUDSON, J.: Concur

FOOTNOTES

[1] 21 O.S.2011, § 701.12(1).

[2] 21 O.S.2011, § 701.12(2).

[3] 21 O.S.2011, § 701.12(4).

[4] 21 O.S.2011, § 701.12(6).

[5] Nolen's statement, admitted at trial as State Exhibit #25, was written as follows:

I was dealing with a batch bruschetta & the white lady (gentile) told me that i need to stir it up after i had already stirred it. I then told her it was no need for it & to tone her voice that im 30 yrs old & not one of her kids, so then she reply im a immature brat and i kind laughed about it in a way of blowin the comment off, so then 5-10 mins passed and she told the black woman on the line that i got caucassians (gentiles) fucked up. so after hering that statement i tells the black woman that i beat on caucassions (gentiles). So then she left the line. Im a Muslim & my religion come before anything!

(Errors in original).

[6] When 21 O.S. 701.10b was enacted in 2006 the statute used the term "mental retardation" throughout. Section 701.10b has been amended just once since its enactment. In 2019, the legislature changed the term "mental retardation" to "intellectual disability" to reflect contemporary use of terms within the medical community. Subsequently, the term "intellectual disability" has largely superseded the term "mental retardation" in both Oklahoma and federal case law. As no other amendments were made to Section 701.10b since its enactment, this opinion will cite to the amended statute and use the term "intellectual disability" instead of "mental retardation" where appropriate.

[7] The record reflects that this was the only known individually administered, scientifically recognized standardized intelligence quotient test administered to Nolen by a licensed psychiatrist or psychologist.

[8] The "practice effect" in neuropsychological testing occurs "whereby individuals who are tested twice in a relatively short period of time will show artificially inflated scores the second time, due to the effects of prior experience and practice with the test stimuli." United States v. Fields, 949 F.3d 1240, 1258 (10th Cir. 2019).

[9] To the extent that expert witnesses relied upon information from lay persons in reaching their conclusions about Nolen's adaptive deficits, we allow consideration of lay witness testimony contradictory to the information relied upon by the expert witnesses.

[10] This information conflicted with evidence that Nolen denied being in special education classes and trial testimony of other school friends who did not believe that Nolen was in special education classes.

[11] Dr. Reschly agreed that Nolen's high school counselor testified that no records came from his middle school indicating that he had been in special education classes. When asked whether he gave more credence to the testimony of students than to the testimony of a school counselor, Dr. Reschly declined to answer but he agreed that the evidence was inconsistent.

[12] Doug Brown, the Superintendent at Idabel Public Schools, testified that the program at Booker T. Washington attended by Nolen was not special education; part of the curriculum at Booker T. Washington included life skills but it was not necessarily for intellectually disabled students. Barbara Johnson, the current principal at Idabel High School testified that she has been at Idabel public schools for thirty-five years. She testified that when Nolen went to high school a student could not be in special education and attend the classes at Booker T. Washington; there was a different curriculum for special education students.

[13] Nolen took the ACT in tenth grade and scored a 9 which, Reschly testified, was a very low score in the 1st percentile. When he took the ACT his senior year he did not fare much better scoring a 12 which is in the 4th percentile. At the time of Nolen's admission into these schools, both required applicants take the ACT but each had open admissions policies allowing students' admission regardless of their ACT scores.

[14] In contrast, one of Nolan's peers, Brandon Hunter, testified that he remembered Nolen from sixth grade and high school. Hunter did not recall having any problems communicating with Nolen. In high school Hunter would pick Nolen up in the summer and they would go to a gym to work out together. They would talk about what was going on; Nolen participated in conversations.

[15] Conversely, Doug Brown testified that Nolen was well liked and respected by his peers. If there was a fight or altercation in the locker room, Nolen typically tried to break it up.

[16] In contrast, Crystal Brown testified that she was a hair stylist who came to know Nolen because she cut his hair. After a while, they became friends and had a close relationship for about two months. Ms. Brown testified that she had conversations with Nolen and she understood what he was saying. When she conversed with him, Ms. Brown felt like Nolen was "very straightforward, serious. I felt like he was pretty intelligent." She clarified that he was not "college-level type intelligent" but he "just knew how to get things done and take care -- take care of hisself [sic]."

[17] He was, however, able to research his religious rights and communicate to human resources his desire to get time off to pray while at work.

[18] That Nolen is an average reader was corroborated by Paige Nolen at trial when she testified that while Nolen did not like to read aloud and would sometimes stutter, he seemed to be an "ok" reader.

[19] That Nolen was able to write and express himself coherently is also shown by State's exhibit 225, his handwritten statement about the verbal altercation he had with Traci Johnson at Vaughn Foods before he was suspended.

[20] Dr. Russell testified that Nolen's skills in the area of expressive communication were "an issue" but she did not state that he had significant limitations in this adaptive skill area.

[21] Dr. Russell acknowledged on cross-examination that during the administration of the FIT-R, Nolen denied having any difficulties in communicating that would interfere with his ability to talk to his lawyers or to testify in court. He specifically said that he did not want to testify.

[22] Dr. Russell's testimony about her methodology in administering the tests and arriving at the IQ score was more thorough at the competency hearing than at the Atkins trial. She explained at the competency hearing that the WASI-II screening test has four subtests. Because Nolen score 62 on the WASI-II, she elected to administer the WAIS-IV full scale IQ test that included ten subtests. Because she administered the full scale IQ test only four weeks after she administered the screening test, she sought to prevent a false heightened score due to the "practice effect" by combining the two tests. She did not administer subtests in the full scale IQ test that were like those already administered in the screening test but rather used the subtests administered in the screening exam to derive the final IQ score.

[23] Dr. Russell acknowledged on cross-examination that although she scored Nolen a zero in the adaptive skill area of communication, it was true that he was able to articulate a successful request for a religious accommodation at work and he also submitted an internal job application in writing outlining his prior experience to request a job change at work. Interestingly, while Dr. Russell testified at the competency hearing that Nolen suffered significant limitations in the adaptive functioning area of communications, she did not clearly opine at the Atkins trial that Nolen suffered significant limitations in this adaptive functioning area.

[24] It was clarified that "mental retardation" is now called "intellectual disability" and Dr. Roberson's testimony mirrored the statutory definition in Section 701.10b.

[25] While the district court's conclusions at the competency hearing regarding when the intellectual disability manifested differs from the conclusions apparently reached by the jury at the Atkins trial, the differing conclusions are of no consequence as different evidence was presented at each proceeding.

[26] Many of the answers given by Nolen included the word "Alhamdulillah", which Nolen explained, means "Praise be to Allah in English."

[27] Dr. McGarrahan administered two tests to measure malingering -- the DOT Counting Test and the Digit Span Subtest from the WAIS-IV. She concluded that Nolen was not malingering because he had nothing to gain by doing so; he stated that his goal was to plead guilty and be sentenced to death and he knew that he would not be able to do this if he was mentally ill. Dr. McGarrahan acknowledged on cross-examination, though, that Nolen had previously taken the TOMM, a test designed specifically to assess malingering, and had scored within a range raising concern for malingering.

[28] Dr. Redcorn agreed on cross-examination that weight loss and difficulty sleeping can be indicative of something other than mental illness; these "symptoms" are "pretty typical" for people in the county jail.

[29] State's Exhibits 102, 104, and 108 depicted the victim, Colleen Hufford, at the crime scene and State's Exhibit 193, taken at the medical examiner's office, showed a portion of her face and the knife used in the attack.

[30] When the admissibility of State's Exhibit 193 was discussed prior to trial, defense counsel appeared not to object to its admission if the photograph were cropped. State's Exhibit 193 appears to have been cropped as per defense counsel's request as it is smaller than the other photographs admitted into evidence and defense counsel did not specifically object to the admission of this cropped photograph at trial.

LUMPKIN, JUDGE: CONCUR IN RESULTS

¶1 I concur in the results reached by the Court in this case. I write to set out the proper procedure to determine if a defendant is exempt from the death penalty in accordance with the U.S. Supreme Court decision in Atkins v. Virginia, 536 U.S. 304 (2002); this Court's decision in Murphy v. State, 2002 OK CR 32, 54 P.3d 556, overruled in part by Blonner v. State, 2006 OK CR 1, 127 P.3d 1135); and the implementation of these decisions pursuant to 21 O.S.2011, § 701.10.

¶2 Throughout the implementation of the Supreme Court's determination that the Eighth Amendment to the U.S. Constitution precludes the execution of a person who is mentally retarded/intellectually disabled (MR/ID), the process is addressed in three steps. I write to set out what I consider to be the legislative history of our current statute passed to address mental retardation/intellectual disability, specifically: 1) 21 O.S.2011, § 701.10; 2) the supporting medical/legal authority addressing the nature of mental retardation/intellectual disability and the nature of proof required to show a person qualifies under its criteria; and 3) application of this criteria and proof to the current case.

I.

Legislative History and Origin of the Limitation to the 
Eighth Amendment.

¶3 In Atkins, the Supreme Court of the United States held that the Eighth Amendment's prohibition against "cruel and unusual punishment" precluded the imposition of the death penalty on a mentally retarded criminal. Atkins, 536 U.S. at 321.

¶4 In its analysis, the Supreme Court stipulated that, at Atkins' trial below, defense counsel relied on expert testimony from "a forensic psychologist who had evaluated Atkins before trial and concluded that he was 'mildly mentally retarded.'"[1] Atkins, 536 U.S. at 308. The expert's "conclusion was based on interviews with people who knew Atkins, a review of school and court records, and the administration of a standard intelligence test which indicated that Atkins had a full scale IQ of 59."[2] Id. at 308-09. Quoting Stedmans Medical Dictionary, the Supreme Court defined mental retardation[3] as "requir[ing] not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." Atkins, 536 U.S. at 318.

¶5 However, rather than set out a uniform test for determining the mental status of criminal defendants, the Court, noting both the "serious disagreement about the execution of mentally retarded offenders" and the fact that "[n]ot all people who claim to be mentally retarded . . . will fall within the range of mentally retarded offenders," left to the "State[s] the task of developing appropriate ways to enforce the constitutional restriction." Id. at 317.

¶6 As we noted in Murphy, the Oklahoma Legislature had attempted to address the issue of mental retardation, but the Governor at the time had precluded the passage of that legislation. Due to that failure to act, and in light of Atkins, this Court was forced to act. Accordingly, we adopted the following definition for mental retardation in Murphy to apply to defendants, in capital cases, alleging they are not eligible to be sentenced to the death penalty:

A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

It is the defendant's burden to prove he or she is mentally retarded by a preponderance of the evidence at trial. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative. However, no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.

This standard shall be used at all future and pending capital trials, until such time as it may be replaced by a suitable legislative enactment.

Murphy, 2002 OK CR 32, ¶ 31, 54 P.3d at 567-68.

¶7 Subsequent to the publication of Murphy, the language above was codified by the Legislature in 21 O.S.2011, § 701.10b. Therefore, this guidance must also be considered as a part of the legislative history which goes to the interpretation of § 701.10b.

¶8 I agree with Judge Rowland that we are to apply the plain language of the statute in this case. However, the interpretation of statutes is always to ensure the application of the legislature's intent in the statute. In Oklahoma, finding legislative history to determine that intent is extremely rare. However, in this case, we do know the legislature's intent, and that is to comply with the Supreme Court's decision in Atkins and the codifying of our decision in Murphy. In that regard, we first look to what evidence the Supreme Court used to form their opinion as set out above.

¶9 As a result, I view the statute requires a defendant to put forth, by a preponderance of the evidence, that: 1) he or she has a subaverage intelligence level of 70 or below applying the standard deviation; 2) it was manifested before age 18; and 3) if those criteria are met, then he/she must also show adaptive functioning limitations in at least two (2) of the above listed areas of life.

II.

Analysis of the Limited Application of the Exemption due
to the Extremely Rare Occurrence of Mental
Retardation/Intellectual Disability in the Population as a Whole,
Including both Legal and Medical Evidence to Prove a Person is 
Mentally Retarded/Intellectually Disabled.

¶10 Approximately 6.5 million people, or less than 2% of the population, in the United States have an intellectual disability. See Measuring Mental Retardation; IQ tests, Social Security Disability Law & Procedure in Federal Court § 5:42 ("only 2% of the general population scores 69 or below"). The causes of MR/ID in that approximated 2% of the population can be broken down into three subcategories: prenatal, perinatal, and postnatal causes. Of these three causes, prenatal causes (such as genetic syndromes, brain malformations, or environmental influences) are the most common, and postnatal causes (such as traumatic brain damage, infection, or severe malnutrition) are the rarest. Genetic causes alone account for 30% to 50% of all intellectual disability cases. Other research yields data that some 25% to 40% of MR/ID causes are unknown. While the precise statistical breakdown of the pre-, peri-, and postnatal causes of this 2% has proved evasive in my research efforts, it is evident that the cases of postnatal causes of ID are few and far between.

¶11 The following chart lays out the stages at which mental retardation can be identified and the causes so identified by the medical community.

 
 
 
 Prenatal
 
 
 Environmental factors
 
 
 -Deficiencies , such as iodine deficiency and folic acid deficiency
 -Severe malnutrition in pregnancy-Rh incompatibility
 -Using substances such as alcohol (maternal alcohol syndrome), nicotine,
 
 
 
 
  
 
 
 and cocaine during early pregnancy
 -Exposure to other harmful chemicals such as pollutants, heavy metals, and harmful medications such as thalidomide, phenytoin and warfarin sodium in early pregnancy
 -Maternal infections such as rubella, syphilis, toxoplasmosis, cytomegalovirus and HIV
 -Others such as excessive exposure to radiation
 
 
 
 
 Chromosomal abnormalities(cytogenetic techniques)
 
 
 Trisomy 21
 Partial trisomies (e.g., 4p, 9q)
 Aneusomies of the X chromosome
 Partial deletions (eg, 5p-/cri de chat)
 Translocations
 
 
 
 
 Cryptic chromosomal abnormalities(complex methods)
 
 
 -Microdeletions or microduplications of chromosomal segments
 Wolf-Hirschhorn syndrome
 Pallister-Killian syndrome
 18p deletion
 -Cryptic subtelomeric rearrangements (eg, deletions, duplications)
 -Cryptic interstitial rearrangements - microdeletion :
 a-thalassemia with mental retardation ,Smith Magenis syndrome (deletie 17p11.2.) , Rubinstein-Taybi syndrome (16p13.3)
 -Cryptic interstitial rearrangements - duplications:

 15q11-13 duplication: Kabuki Makeup syndrome
 -Contigous gene syndrome
 
 
 
 
 Mutation of a single gene
 
 
 X-linked mental retardation
 Mowat-Wilson syndrome
 Cornelia de Lange syndrome
 
 
 
 
  
 
 
 Lissencephaly with cerebellar hypoplasia
 Walker--Warburg syndrome (also known as HARD syndrome)
 Muscle--eye--brain disease (MEB)
 Fukuyama congenital muscular dystrophy (FCMD) with type 2 lissencephaly
 Neurofibromatosis type 1 (NF1);
 Cerebral malformations
 
 
 
 
 Perinatal
 
 
 3rdtrimester
 
 
 Complications of pregnancy Diseases in mother such as heart and kidney disease and diabetes Placental dysfunction
 
 
 
 
 During delivery
 
 
 Severe prematurity, very low birth weight, birth asphyxia Difficult and/or complicated delivery Birth trauma, vascular accidents
 
 
 
 
 Neonatal
 
 
 Septicemia, severe jaundice, hypoglycemia
 
 
 
 
 Postnatal
 (in infancy
 and childhood)
 
 
 Traumatic, accidental, infectious
 
 
 Brain infections such as tuberculosis, encephalitis, and bacterial meningitis Head injury Chronic lead exposure Severe and prolonged malnutrition Gross under stimulation
 
 
 
 
 MR that develops after a period of normal development
 
 
 Lysosomal storage diseases
 Peroxizomal disorders
 Exposure to heavy metals, pesticide, malnutrition
 
 
 
 
 Multifactorial or complex inheritance MR
 
 
  
 
 
 

Maria Puiu et.al., The Genetics of Mental Retardation, Genetic Disorders (Jan. 9, 2013), (https://www.intechopen.com/books/genetic-disorders/the-genetics-of-mental-retardation).

¶12 James W. Ellis et. al. set out the following in their Hofstra Law Review article, "Evaluating Intellectual Disability: Clinical Assessments in Atkins Cases," to wit:

The final component of the definition of intellectual disability is the stipulation that the disability must have originated during the developmental period of life. This requirement has proven to present the fewest issues for diagnosticians in Atkins cases, and few cases have turned on this prong. The vast majority of people with the level of intellectual impairment to satisfy the first prong of the definition--and the deficits in adaptive behavior to satisfy the second prong-- first experienced their disability in childhood, and for some, the cause can be traced back to their birth or their genetic make-up. The only individuals who are excluded from the category by the age of onset requirement are individuals whose disability can be traced to events during adulthood. Examples would include individuals whose neurocognitive impairments occurred post-adolescence as with dementia, or brain injuries due to post-adolescence accidents. But for diagnostic purposes, adult-onset impairments can be identified and distinguished from intellectual disability.

The only major point of confusion about the age of onset requirement in Atkins cases appears to involve the definition's requirement that the disability must have "originated" or "manifested" during the developmental period of life. The definition does not require that there have been IQ tests or formal assessments of adaptive deficits while the individual was a child. Whether a person had received such testing or diagnostic services as a child is, of course, a matter of happenstance, with no relevance to questions of culpability. Educational policy choices, even routine bureaucratic decisions, may play a part in determining whether a child is tested and properly diagnosed as having intellectual disability.

If a defendant currently meets the [other] two criteria[4], and there are indications of impairment, delayed development, etc., from childhood, and if there is no indication that the impairment resulted from causes that occurred in adulthood, a diagnosis of intellectual disability is appropriate, and constitutionally compelled.

James W. Ellis et. al., Evaluating Intellectual Disability: Clinical Assessments in Atkins Cases, 46 Hofstra L. Rev. 1305, 1336--39 (2018) (footnotes omitted).

III.

Application of Legal and Medical Requirements to the 
Evidence in this Case.

¶13 Turning now to the facts in this case, I apply the law and medical criteria set out above. First, Appellant does have an IQ test that shows his current IQ is 69, albeit, this test was conducted some two years after the crime and its validity is questionable due to the manner in which it was administered. The question of the test validity goes to the weight and credibility the jury may have given it.

¶14 Second, there is no evidence that whatever Appellant's intelligence level might be, it was manifested before age 18. No intellectual functioning tests were administered before age 18. This fact requires us to look at other evidence, as described above, to indicate the onset of his level of functioning was manifest before age 18.

¶15 Appellant progressed through his public education without being placed in any special education programs. While he was assigned to the alternative school at one point, the evidence does not indicate it was due to any intellectual disability. His grades over this span, while up and down at times, do not reveal any consistent intellectual problems. His sister testified Appellant could read and did so often; however, he did not like to read out loud. The record is void of any evidence that he was the victim of any accident that could be attributed as a cause of any intellectual disability. Thus, this record lacks an evidentiary base to establish whatever Appellant's intellectual status is, it did not manifest itself before age 18.

¶16 This failure to establish any intellectual disability prior to age 18 answers the question of whether Appellant qualifies as mentally retarded/intellectually disabled under Atkins and is exempt from the death penalty. In Atkins, the Supreme Court recognized that not all individuals with a sub-average intelligence will qualify for the exemption. This is so when each of the three requirements cannot be met. Each is separate and distinct, but build on one another to determine at the end if a defendant is or is not eligible for the death penalty under the Eighth Amendment. As set out in Part II, above, there are ways to put forth evidence, even without an IQ test, that a person is suffering from mental retardation/intellectually disability which existed and was manifest before age 18. However, Appellant in this case has failed to do so.

¶17 Third, even if this Court examined the record to determine if Appellant has proved significant limitations, in at least two areas of adaptive functioning he fails. Appellant graduated from high school and attended college. He even received an A grade in a college psychology course. He was gainfully employed, having held the job at Vaughn Foods for over a year before the commission of the crimes in this case. Appellant lived independently, drove a car, participated in personal socializing by going to the mosque, and used technology.

¶18 In summary, I find Appellant has failed to show by a preponderance of the evidence that he is mentally retarded/intellectually disabled as required under Atkins and 21 O.S. § 701.10. Under the law and the evidence, he is eligible for the death penalty and the evidence is sufficient to affirm the verdicts and sentences rendered by the jury and the District Court of Cleveland County.

IV. 

Conclusion 

¶19 It is for the above reasons that I believe the qualification for exemption from the death penalty due to mental retardation/intellectual disability is a three-step process: (1) sub-average intellectual functioning; (2) manifested before the age 18 (as set out above); and (3) is additionally accompanied by significant limitations in two or more adaptive functions as set out in § 701.10b. As the Supreme Court referenced in the cited materials in Atkins, as well as this Court's analysis in Murphy and Fuston v. State, 2020 OK CR 4, ¶¶ 15-38, 470 P.3d 306, 315-318, the establishment of the first prong of sub-average intellectual functioning is separate and apart from the third prong of significant limitations in two or more adaptive functions. Therefore, if a defendant cannot establish the first prong of sub-average intellectual functioning, then there is no need to move onto the third prong of significant limitations in two or more adaptive functions. While each of the three prongs work together to ultimately decide the issue of whether Eighth Amendment MR/ID has been established, one prong alone does not define the other. We should be consistent with this Court's interpretation of Atkins, Murphy, and Fuston.

FOOTNOTES

[1] The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50--55 to approximately 70.

Atkins, 536 U.S. at 309 n.3 (internal citations omitted).

[2] At the sentencing phase, Dr. Nelson testified: "[Atkins'] full scale IQ is 59. Compared to the population at large, that means less than one percentile.... Mental retardation is a relatively rare thing. It's about one percent of the population." According to Dr. Nelson, Atkins' IQ score "would automatically qualify for Social Security disability income." Dr. Nelson also indicated that of the over 40 capital defendants that he had evaluated, Atkins was only the second individual who met the criteria for mental retardation. He testified that, in his opinion, Atkins' limited intellect had been a consistent feature throughout his life, and that his IQ score of 59 is not an "aberration, malingered result, or invalid test score."

Atkins, 536 U.S. 309 n.5 (internal citations omitted).

[3] Stedmans Medical Dictionary 777730: "[S]ubaverage general intellectual functioning that originates during the developmental period and is associated with impairment in adaptive behavior. The American Association on Mental Deficiency lists eight medical classifications and five psychological classifications; the latter five replace the three former classifications of moron, imbecile, and idiot. Mental retardation classification requires assignment of an index for performance relative to a person's peers on two interrelated criteria: measured intelligence (IQ) and overall socioadaptive behavior (a judgmental rating of the person's relative level of performance in school, at work, at home, and in the community). In general an IQ of 70 or less indicates mental retardation (mild = 50/55--70; moderate = 35/40--50/55; severe = 20/25--35/40; profound = below 20/25); an IQ of 70--85 signifies borderline intellectual functioning."

[4] As laid out in 21 O.S.2011, § 701.10b(C), the other two criteria that the defendant must meet are (1) intellectual disability by showing significantly subaverage general intellectual functioning (i.e. an IQ score of 70 or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist) and (2) significant limitations in adaptive functioning.

LEWIS, JUDGE, SPECIALLY CONCURRING:

¶1 I concur in the denial of relief, and write separately on the proper limitations of voir dire. A trial court may properly exercise its discretion to limit voir dire into specific factual hypotheticals about a party's theory of defense. Black v. State, 2001 OK CR 5, ¶ 19, 21 P.3d 1047, 1058 (limiting voir dire concerning hypotheticals grounded in facts of the case).

¶2 However, in cases of this gravity, the court should permit a generalized inquiry about prospective jurors' opinions, conceptions, beliefs, or potential biases about a legal or factual defense having likely application to the case. Such inquiry provides information relevant to potential challenges for cause and intelligent use of peremptories.

¶3 The court need not indulge an inquisition, and may direct counsel to come to the point, but it should not arbitrarily cut-off voir dire about a legal or factual defense. A few thoughtful questions may show a juror is either too biased to serve in the case or should be removed by peremptory challenge.

 






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1992 OK CR 79, 845 P.2d 1272, FISHER v. STATE
Discussed at Length
 2001 OK CR 5, 21 P.3d 1047, 72 OBJ 858, BLACK v. STATE
Discussed
 2002 OK CR 32, 54 P.3d 556, MURPHY v. STATE
Discussed at Length
 2005 OK CR 26, 126 P.3d 646, LAMBERT v. STATE
Discussed
 2006 OK CR 1, 127 P.3d 1135, BLONNER v. STATE
Discussed
 2006 OK CR 8, 134 P.3d 816, BROWNING v. STATE
Discussed
 2006 OK CR 19, 139 P.3d 907, HOGAN v. STATE
Discussed at Length
 2006 OK CR 28, 138 P.3d 549, HOWELL v. STATE
Discussed
 2006 OK CR 46, 147 P.3d 245, STOUFFER v. STATE
Discussed
 2007 OK CR 12, 157 P.3d 143, GLOSSIP v. STATE
Discussed
 2007 OK CR 17, 158 P.3d 467, WOOD v. STATE
Discussed
 2007 OK CR 27, 164 P.3d 1089, COLE v. STATE
Discussed
 2007 OK CR 29, 164 P.3d 208, EIZEMBER v. STATE
Discussed at Length
 2007 OK CR 34, 168 P.3d 185, MALONE v. STATE
Discussed
 2008 OK CR 19, 188 P.3d 208, WILLIAMS v. STATE
Discussed
 2009 OK CR 1, 201 P.3d 869, JONES v. STATE
Discussed at Length
 2009 OK CR 7, 204 P.3d 777, HORN v. STATE
Discussed at Length
 2009 OK CR 11, 205 P.3d 1, GRANT v. STATE
Discussed at Length
 2009 OK CR 13, 206 P.3d 1020, HANSON v. STATE
Discussed
 2009 OK CR 31, 223 P.3d 980, SANCHEZ v. STATE
Discussed at Length
 2010 OK CR 10, 236 P.3d 671, GOODE v. STATE
Discussed at Length
 2010 OK CR 14, 235 P.3d 640, MITCHELL v. STATE
Discussed at Length
 2011 OK CR 6, 248 P.3d 918, HARMON v. STATE
Discussed at Length
 2011 OK CR 15, 255 P.3d 425, ROBINSON v. STATE
Discussed
 2012 OK CR 3, 269 P.3d 949, STATE v. HOOLEY
Discussed
 2012 OK CR 5, 272 P.3d 720, JOHNSON v. STATE
Discussed at Length
 2016 OK CR 18, 387 P.3d 922, PULLEN v. STATE
Discussed
 2017 OK CR 10, 400 P.3d 834, BOSSE v. STATE
Discussed at Length
 2018 OK CR 10, 421 P.3d 890, NICHOLSON v. STATE
Discussed
 2018 OK CR 14, 422 P.3d 782, LEE v. STATE
Discussed
 2018 OK CR 20, 423 P.3d 617, TRYON v. STATE
Discussed at Length
 2018 OK CR 31, 431 P.3d 929, BENCH v. STATE
Discussed at Length
 2018 OK CR 33, 431 P.3d 985, BIVENS v. STATE
Discussed
 2019 OK CR 15, 446 P.3d 1248, TAFOLLA v. STATE
Discussed
 2019 OK CR 22, 450 P.3d 933, HARRIS v. STATE
Discussed
 2020 OK CR 4, 470 P.3d 306, FUSTON v. STATE
Discussed
 2000 OK CR 11, 4 P.3d 702, 71 OBJ 1304, Bland v. State
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2401, Relevant Evidence Defined
Cited
 12 O.S. 2402, Relevant Evidence Generally Admissible - Irrelevant Evidence Inadmissible
Cited
 12 O.S. 2403, Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Cumulative Nature of Evidence
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 701.10b, Intellectual Disability - Death Penalty - Burden - Notice - Evidentiary Hearing - Standard of Review - Instructions
Discussed at Length
 21 O.S. 645, Assault, Battery, or Assault and Battery with Dangerous Weapon
Cited
 21 O.S. 652, Shooting with Intent to Kill - Assault and Battery with Deadly Weapon, etc.
Cited
 21 O.S. 701.7, Murder in the First Degree
Cited
 21 O.S. 701.10, Sentencing Proceedings for First Degree Murder - State Seeking Death Penalty
Discussed at Length
 21 O.S. 701.12, Aggravating Circumstances
Discussed at Length
 21 O.S. 701.13, Review of Death Penalty Sentence
Discussed
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 1175.1, Definitions
Cited
 22 O.S. 1175.3, Hearing - Date - Evidence - Orders - Examination of Accused - Instructions to Physician
Cited
 22 O.S. 1175.4, Post-examination Competency Hearing - Evidence - Presumptions - Jury Trial - Presence of Accused - Witnesses - Instructions
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA